**CARTWRIGHT VAN LINES, INC., Plaintiff,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

**Bekins Van Lines Co. et al., Intervenors.**

**No. 72 CV 122 W-4.**

United States District Court,
W. D. Missouri, W. D.

Aug. 4, 1975.

James A. Polsinelli, Local Counsel, Kansas City, Mo., Charles Ephraim, Ephraim & Clark, Washington, D.C., for plaintiff.

Frederick O. Griffin, Local Counsel, Asst. U. S. Atty., Kansas City, Mo., Lloyd J. Osborn, Interstate Commerce Comm., Washington, D.C., for defendants.

Before WEBSTER, Circuit Judge, and COLLINSON and HUNTER, District Judges.

MEMORANDUM AND ORDER

ELMO B. HUNTER, District Judge.

This is an action to set aside an order of the Interstate Commerce Commission (Division I acting as an Appellate Division) dated January 31, 1973. Pursuant to 28 U.S.C. § 2325 requiring a district court of three judges to be convened in suits attacking orders of the Interstate Commerce Commission, the undersigned Court was designated to hear the case.

Plaintiff, Cartwright Van Lines, Inc., is a corporation organized and existing pursuant to the laws of the state of Washington, having its principal place of business in Grandview, Missouri. It is a small, class one motor common carrier of household goods, with gross, annual revenue (1970) of between three and four million dollars. It operates 41 trucks, 71 tractors and 85 trailers. It owns only 2 tractors and 27 trailers. The remainder of the fleet is owned either by agents or by owner-operators. Its 1970 net income before taxes was $43,643.00.

The defendants are the Interstate Commerce Commission, three carriers of household goods who were parties in opposition in the proceedings before the Commission, and the United States which

was made a party on this appeal and which stands neutral in this controversy.

Cartwright's total authority to transport household goods was the sum of some thirty-four individual grants of authority to transport household goods between a limited number of points in forty-six states and the District of Columbia,[1] and did not include the right to operate *directly* between any and all points contained in its various grants of authority. Many of Cartwright's authorities touched another of its authorities so as to provide "gateways" which to some extent Cartwright used in its transportation operations.[2]

Believing the use of its gateways to be uneconomical and burdensome in that such use resulted in longer routes than would the use of a direct route, on October 20, 1969, Cartwright applied to defendant Commission for permission to eliminate 16 gateways and to be authorized to render direct service to all points it could serve through its tacking process. Cartwright also sought authority to serve the state of Nevada.[3] Seven common carriers of property, specializing in the transportation of household goods, filed protests. The Department of Defense intervened in support of Cartwright's application. Fernstrom Storage and Van Company intervened as a party in opposition.

As a result of appropriate hearings, the Hearing Examiner found against Cartwright. Eventually his decision with one modificiation, was adopted on review by the appellate division of defendant Commission.[4]

*Cartwright's Two Contentions*

On this appeal Cartwright contends that (1) defendant Commission applied *decisional standards or criteria* in ruling Cartwright's application different from those employed by it respecting other like contemporary applications, thereby depriving Cartwright of a full and fair hearing; and (2) that defendant Commission failed to discharge its responsibilities under the National Environmental Policy Act of 1969 by summarily finding no significant effect upon the quality of the human environment "while contemporaneously finding that such issues have a significant environmental impact." Cartwright's counsel both in his supporting brief and in oral argument emphasized that Cartwright is *not* claiming that the action of defendant Commission, for reasons of substantial evidence, is lacking, and concedes that no substantial evidence problem is presented.

*Cartwright's First Contention*

Illuminating its contention that defendant Commission applied different

1. Cartwright did not have authority to transport in Hawaii, Alaska, North Dakota and Nevada.

2. A "gateway" operation results when a carrier tacks or combines two grants of authority at a point common to both in order to provide a service from a point authorized to be served under one grant of authority to a service point contained within another. The common point is called a gateway. For example, a carrier holds authority from points in the state of Washington to points in the state of Minnesota, and, additionally, is authorized to serve from points in Minnesota to points in California. The carrier is *permitted* to tack these authorities to provide a through service from Washington to California by routing traffic through the common point, the state of Minnesota. Some of Cartwright's tacking is very complex. In going from Maryland to the west coast five separate authorities and four separate gateways are involved.

3. Cartwright's application was assigned Docket Number MC-88368 (Sub-No. 22) and titled "Cartwright Van Lines, Inc., Extension-Elimination of Gateways".

4. The Hearing Examiner did not consider the evidence presented by the Department of Defense concerning the military commercial traffic in concluding that Cartwright was not providing an effective and competing service with existing carriers. The Hearing Examiner felt that since the Department of the Defense rotated this business, it lacked any competitive effect. However, the Commission did consider this evidence and still adopted the remainder of the findings and the result reached by the Hearing Examiner.

decisional standards or criteria in denying Cartwright's application from those employed by it in granting other like contemporaneous applications, Cartwright asserts the Commission in *Fernstrom Storage and Van Company Extension-Nationwide Service,* 110 M.C.C. 452 (1969) *aff'd sub nom. Aero Mayflower Transit Co., Inc. v. United States,* 1970–1972 Fed.Carr.Rep. #83,308 at 55,442 (S.D.Ind.1972), not otherwise reported, and in *King Van Lines, Inc., Extension —48 States,* 114 M.C.C. 866 (1972) adopted new and different criteria applicable only to a select number of applicants who somewhat contemporaneously filed for nationwide type authority to transport household goods, and did not give Cartwright the benefit of that criteria, although Cartwright had filed its application prior to the time some who successfully received that beneficial treatment had filed. Defendants respond that the Commission did not adopt new and different criteria and had applied the same traditional criteria to all.

Some preliminary discussion of background matters will aid in understanding our resolution of the issues presented.

An application to eliminate gateways is an application for a new authority requiring a certificate of convenience and necessity. This is so because even though a carrier might perform service from point A to point C by tacking its separate authorities from A to B and from point B to C via its gateway, the carrier has never been granted authority to operate directly between points A and C. No public need has been shown for that service (A to C) and no consideration has been given to the effect of that service on those carriers authorized to service directly those two points, A to C.[5]

The required finding for any certificate of convenience and necessity to issue is set out in Section 207(a) of the Interstate Commerce Act, 49 U.S.C. § 307(a) which provides, "that the proposed service . . . is or will be required by the present or future public convenience and necessity . . .." The burden of proof on the issue of public convenience and necessity rests on the particular applicant for authorization of the proposed service.

The traditional underlying criteria for showing the requisite pubic convenience and necessity for the proposed service are: (1) whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; (2) whether this purpose can or will be serviced as well by existing carriers; and (3) whether this purpose can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest. *Pan American Bus Lines Operation,* 1 M.C.C. 190 (1936). Thus, the traditional method by which a carrier may show that the public convenience and necessity requires the proposed service is to present evidence of supporting shippers demonstrating the

5. As noted in *Motor Common Carriers Property—Routes and Service,* 88 M.C.C. 415 at 423, " . . . the two or more authorities which may be tacked at common service points will in virtually every instance have been obtained and without any intention or even realization that they might one day be used in combination. Thus it is not any requirement of the Interstate Commerce Act or of this Commission that forces a carrier to operate in a circuitous manner. It is rather a wish of the carrier itself to join two of its authorities in order that it can provide a through service not specifically authorized by its certificates and for which it has never made a showing that there is a public need." And, as stated in *Martin Van Lines, Inc., Extension—12 States,* 79 M.C.C. 767, 771, "There is no requirement of this Commission that applicant join separate operating rights and render service to the public from points in one authority to points authorized under another operating right. * * * (It) is a manner of operation undertaken by applicant on its own volition. To authorize applicant to conduct the proposed operations which it cannot now perform efficiently and effectively in competition with existing carriers, without any showing of need therefor, would be directly contrary to the mandate of the (Interstate Commerce) Act".

inadequacies of the existing service and the need for additional service.

However, with regard to applications for direct authority to eliminate the necessity for observing gateways, the Commission has adopted alternative criteria by which a carrier may show that the public convenience and necessity requires the proposed service without presenting shippers evidence of public need. Rather, it is sufficient for the applicant to show: (1) that the elimination of the gateways will result in more economical operations; (2) that applicant is *actually* transporting a substantial volume of traffic from and to the points involved by operating in good faith through the gateways, and (3) that elimination of the gateways would not enable it to institute a new service or a service so different from that presently provided as to materially improve its competitive position to the detriment of existing carriers. *Childress-Elimination of Sanford Gateway,* 61 M.C.C. 421 (1952); *Service Trucking Co., Inc., Extension-Frozen Pie and Pastries,* 88 M.C.C. 697 (1962).

In support of its contention that a new and third standard was established in *Fernstrom* and *King,* Cartwright notes that in the latter part of the 1960's the defendant Commission became acutely aware of a need for more carriers in the household goods area to have nationwide or equivalent authority.[6] Cartwright quotes from *King Van Lines, Inc., Extension—48 States,* 114 M.C.C. 866 (1972), page 869–70: "This (King) application is one of several requests for transcontinental household goods authority which were filed shortly after the issuance of the entire commission's decision in *Fernstrom Storage and Van Company—Nationwide,* 110 M.C.C. 452 (1969). Nationwide authority has been granted in seven of these proceedings essentially on the basis of finding (1) *that the applicants are already effective* competitors for household goods traffic over much of the country, and (2) that conditions prevailing in the industry at the time of filing were such as to warrant the authorization of additional nationwide service. * * * As can be readily observed we are following the *criteria established in the Fernstrom case. . .*" * * * The instant application, filed contemporaneously with the application (of Lyon, Red Ball and Neptune) must be decided on the same standards as those applications, and accordingly must be granted."[7] Cartwright spotlights the words above quoted, "established in the Fernstrom case" as establishing a new, third and favorable standard or criteria which the Commission failed to carry forward and apply to Cartwright.

Recognizing that opinion writing is not an exact science, we have very carefully examined the *Fernstrom* and *King* cases and are convinced they did not establish a third set of standards or criteria but simply applied the traditional standard of public need and the traditional criteria to determine the presence or absence of public need as shown by the record of the particular case.

Thus, in *Fernstrom,* as we read that decision, the Commission simply applied

6. See 84th Annual Report to Congress (June 30, 1974) at pages 52–53 where the Commission stated, "Thus, in *Fernstrom Storage & Van Company Extension—Nationwide* (110 M.C.C. 452) we granted nonradial household goods authority. This was the first such grant in several decades." The report reviewed the quality and quantity of the service available from existing carriers and concluded that, "due primarily to their failure to provide timely service, these carriers were not able to provide reasonably adequate service. * * * It was determined that the slightly detrimental effect to the existing carriers would be outweighed by the more adequate service that would become available to the public."

7. The King case was filed shortly after the Cartwright case but was decided shortly before the Cartwright case was decided. Of the six applicants including King who filed somewhat contemporaneously plaintiff's application preceded three of them. Two other of those applicants, as well as plaintiff, were not successful. The others, including protestant Lyons, were successful.

the traditional criteria to the record of that case. In doing so, the Commission summarized that applicant's evidence of the inadequacies of the existing service and, hence, the need for additional services, and found the statutorily required showing of public convenience and necessity to have been satisfied. In *King* the Commission summarized the very extensive evidence of shipper dissatisfaction with present services and a need for additional services. While the above quoted language from *King* which has caused Cartwright to believe a third standard has been established is a less than perfect expression of what the Commission was actually doing, we have no doubt left, after taking that language into consideration with all else that was said and done in both *Fernstrom and King,* that no new decisional standard or criteria was established in either of those two cases.

Nor did the defendant Commission believe it had set new or had changed old criteria or standards, as evidenced by what it said in *Engel Bros., Inc.—Extension—Household Goods 40 States, aff'd sub nom., Engel Van Lines, Inc. v. United States,* 374 F.Supp. 1217 (D.N.J. 1974).[8] In *Engel* the contention was that the Commission had established new and different criteria in *Fernstrom* and *King* for the granting of new authority and had denied Engel the benefit of it. In rejecting that contention the district court stated (374 F.Supp. at page 1221): "It is evident from the foregoing analysis that the standards applied in the three cases (Engel, King and Fernstrom) were consistent." The district court also said, "Engel has been unable, however, to adduce any law showing that the Commission was bound under the due process clause of the Fifth Amendment to accord to Engel the same favorable conclusion that was accorded the applications in the *Fernstrom* and *King* cases." And in *Towne Services Household Goods Transportation v. United States,* 329 F.Supp. 815 (W.D.Tex., 1971) a similar contention was made. At page 820, the district court responded, "A basic premise of plaintiff's entire argument seems to be based on the proposition that since other carriers in recent years have been granted unrestricted household goods certificates *on the basis of evidence adduced in other proceedings,* the plaintiff is entitled to a similar certificate as a matter of right. This reasoning fails to recognize that if the Commission was required in an unbridled fashion to continue to issue these unrestricted certificates that eventually those carriers charged with the public responsibility of rendering a service as a carrier, based on convenience and necessity of the public, would be destroyed. This premise also completely misconceived the statutory scheme under which motor carrier certificates are granted, and the nature of the burden which must be borne by one who seeks such a certificate." (Emphasis ours.)

As an additional contention Cartwright urges that to do what the Commission did is violative of the doctrine announced

8. In *Engel* the Commission stated: "The burden of proof imposed by the statute upon applicant herein does not differ from that imposed in King and the other proceedings mentioned. That burden is to show that the operation or service proposed will serve a public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers, and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest. *Pan American Bus Lines Operation,* 1 M.C.C. 190 (1936)."

"The instant proceeding differs, however, in two major respects from *King, Trans-American,* and the other named contemporaneous proceedings. First, the latter proceedings were decided under the cloud of a crisis *portrayed on the record in those proceedings, and no such crisis appears on the instant record,* and second, there was *convincing evidence in those proceedings,* of a public need or demand for transportation services which existing carriers were unable or unwilling adequately to supply, while *no such finding can be made on the instant records."* Emphasis added.

in *Ashbacker Radio Corp. v. F.C.C.*, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945) to the effect that where two bona fide applications are mutually exclusive, both must be given a hearing before deciding which one succeeds.

However, the *Ashbacker* doctrine is not applicable to the instant case.[9] The case before us does not present a situation where only one of two contemporaneous applicants can succeed. Nor does it present a situation where if some of the contemporaneous applicants succeed, Cartwright cannot succeed in its efforts to obtain the desired authorization. Rather the situation is that any and all applicants can succeed if that particular applicant on the record made in its hearing satisfies the requirements for obtaining a certificate of public convenience and necessity as set out in the statute, § 207(a) of the Interstate Commerce Act, 49 U.S.C. § 307(a).

Although Cartwright has clearly stated it is not raising any question concerning the substantial evidence rule, some of its argument borders that subject, making it desirable that some attention be given to the Hearing Examiner's (and Commission's) finding and ruling that (1) on the record made "it can only be concluded that Cartwright is not an effective competitor on traffic between points sought to be served by the application, and that approval of the application would permit Cartwright to institute a new service for which a public need therefor must be established," and that (2) Cartwright although endeavoring to do so "has not established a public need for the service proposed."

The evidence adduced at the hearings, including Cartwright's series of traffic exhibits covering all shipments during 1970 between points it is authorized to serve directly or through tacking, indicated that while Cartwright endeavored to provide single line service to all authorized points, observance of its gateways between many of its points was not feasible or economically sound because excessive circuity was involved. Hence, in those instances Cartwright would to an unspecified extent interline particular shipments rather than use its gateway. This would be accomplished by Cartwright transporting the shipment over its own authority to a given intermediate point which another carrier was authorized to serve and there tender the shipment to that carrier for delivery to the ultimate destination over that carrier's authority. The Hearing Examiner found and the Commission adopted the finding that the evidence failed to show that Cartwright had actually operated through its gateways which involved excessive circuity, but rather interlined in such instances.[10] The Hearing Examiner stated that Cartwright had "not shown on this record that it is actually transporting a substantial volume of traffic from and to the points involved and is effectively and efficiently competing with existing carriers for the available traffic."

Cartwright does object to the Hearing Examiner having failed to consider the military commercial traffic in concluding that Cartwright was not providing an effective and competing service with existing carriers. However, the Commission did include that evidence in reaching its findings on that issue and in adopting the result reached by the Hearing Examiner. Obviously if the studies presented in evidence by Cartwright were so set out that they failed to show whether or not the movements handled by Cartwright actually

9. See, *Great Western Packers Express v. United States*, I.C.C. (D.Colo.1966) 263 F. Supp. 347.

10. The Hearing Examiner explained, "The study does not disclose whether or not the interlined shipments, or any of them, could have been moved by Cartwright by utilizing one or more gateways or whether or not the shipments which are indicated as direct actually traversed one or more gateways. * * * . . . it is not possible to determine from this record whether or not the movements handled by Cartwright moved through Gateway points." See, Report and Order, page 18.

utilized and moved through gateway points that failure remains even though 80 percent of Cartwright's traffic shown in the studies were military in nature.[11]

It has been the consistent position of the defendant Commission that interline operations are not probative of a carrier's operation over its gateways and does not justify a grant of authority under the gateway elimination criteria.[12]

Since plaintiff does not claim that any substantial evidence question is raised on this review, there is no need to set out in this opinion the supporting evidence for the above finding concerning Cartwright's failure to show its use of its gateways that involved excessive circuity. We content ourselves with our observation that the finding is a reasonable one and is supported by substantial evidence.

For all the above stated reasons we find no merit in Cartwright's first contention.

*Cartwright's Second Contention*

Cartwright's second contention is that defendant Commission failed to discharge its responsibilities under the National Environmental Policy Act of 1969, (N.E.P.A.) 42 U.S.C. §§ 4331 and 4332 in particular by summarily finding no significant effect upon the quality of the human environment *"while contemporaneously finding that such issues have a significant environmental impact."* Defendants respond (1) that this contention of Cartwright's has been rendered moot by the Commission's gateway elimination rules; (2) that Cartwright has no standing to challenge the Commission's actions on environmental grounds; and (3) that the Commission properly found that the denial of Cartwright's application would have no significant environmental impact.

Turning first to the question of standing, we are aware of that line of cases holding that the fact that one is a competitor of the entity taking the challenged action, and, hence, an economic interest is present, does not give standing to raise a N.E.P.A. challenge.[13] We are also aware that the Commission's negative decision is simply one that leaves Cartwright in the same position it has been in all along, and makes no changes from the status quo. However, we are reluctant to dispose of Cartwright's N.E.P.A. contention on lack of standing in view of the additional fact that it is Cartwright who contends it is the one occasioned to cause environmental damage by the negative decision of the Commission, refusing Cartwright permission to eliminate 16 of its gateways.[14] Restated, Cartwright contends the Commission's denial in February, 1973 of Cartwright's application for direct authority has the effect of causing Cartwright to operate over highly circuitous gateway routes, all to the

11. The Department of Defense's position is that it supports the abolishing of all gateway requirements in all cases, and it did not endeavor to show any specific need for additional service in this particular case. The Department of Defense believes all gateway operations are likely to be wasteful and could lengthen the delivery time of the goods of its service people who might be moving.

12. See Docket MC–15 897 (Sub. No. 8), *O.K. Transfer and Storage Co. Extension—Elimination of Gateways; Midwest Coast, Inc., Extension—Huron, South Dakota,* 74 M.C.C. 233 (1958); *Ashworth Transfer Inc., Extension-Explosives,* 111 M.C. 860 (1970).

13. See *Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Clinton Community Hospital v. Southern Maryland Medical Center,* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975). *United States v. S.C.R.A.P.,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

14. See cases cited in previous footnote. Compare, *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Zlotnick v. D. C. Land Redevelopment Agency* (D. D.C.1974) affirmed 494 F.2d 1157 (1975); *Pizitz v. Volpe,* 467 F.2d 208 (5th Cir. 1972); *Calvert Cliffs' Coors. Com. v. United States A. E. Comm.,* 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). Here, use of substantially more circuitous routes might present additional highway safety hazards, highway congestion, fuel and rubber consumption, air and noise pollution, etc.

detriment of the environment. Hence, Cartwright implies that more than a mere economic interest is involved. We elect to proceed to consider the merits of Cartwright's N.E.P.A. contention.

To understand the above italicized portions of Cartwright's second contention, it is necessary to explain an earlier action of the defendant Commission under its rule making power. The National Environmental Policy Act (42 U.S.C. § 4333) mandates that all agencies of the Federal Government shall review their statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of the statute.

Pursuant to the statutory mandate, defendant Commission undertook an in depth study of the combined environmental impact of all gateway operations, solicited the comments of the general public and of all motor carriers, prepared an extensive impact statement, and then proceeded under its rule making powers to make very substantial changes in its motor common carrier regulatory scheme to effectively reduce adverse environmental effects with a minimum of disruption to the transportation.[15] In its study the Commission found among other items, that most unnecessary fuel consumption resulted from the more circuitous gateway routes. Accordingly, and on February 28, 1974, it issued new rules providing that gateway operations for which the distance traveled exceeds the direct highway distance between the points to be served, by more than 20 percent may no longer be conducted unless an application for direct route authority has been filed with the Commission.[16] Also, where the carrier's operation over a gateway route exceeds by 20 percent or less the distance between the origin and destination points over the most direct available route, the carrier may, but is not required to file a "letter notice" notifying the agency of its intention to conduct direct operations.[17] Thus, for all practical purposes Cartwright has had the benefit of a N.E.P.A. study by defendant Commission that resulted in the Commission finding in effect that the national system of all gateways *considered as a whole* had a substantial effect on the quality of the human environment, and in recognition of its N.E.P.A. duty exercised its rule making power as described above. This, of course, does not relieve defendant Commission from its statutory duties under N.E.P.A. in making decisions and taking other agency action on individual carrier requests for authority for new or modified services. Nor does it mean, as plaintiff contends, that its decision that all gateway operations considered as a whole have a significant effect on the human environment also mean that only a portion of such gateways has that effect. Rather, a separate determination of that question is necessary with regard to each new Commission gateway action or decision.

The defendant Commission in recognition of its duty to make a determination of what the effect of its decision on the Cartwright application would be under N.E.P.A. procedures and standards, decided that the evidence did not indicate that the defendant Commission's decision would in any significant manner affect the quality of the human environment. This decision of the Commission is strongly supported by the

15. *Motor Common Carriers of Property, Routes and Services, Ex parte No. 55 (Sub. No. 8)*, 119 M.C.C. 170 (1973).

16. 49 C.F.R. § 1065(b). Even then, such gateway operations will be permitted only until the direct route application has been decided. The Commission is endeavoring to expedite the handling of such applications.

17. 49 C.F.R. § 1065(a). Defendant agency advises that Cartwright has filed 67 such letter notices. Presumably this permits Cartwright to use the direct route rather than conform to the former gateway use requirement.

record in this case. The record shows that very little, if any, traffic would actually pass through Cartwright's more circuitous gateways. Cartwright's evidence reflected a high incidence of shipments interlined with other carriers rather than transported by Cartwright through its gateways. The Hearing Examiner attributed such interlining to the fact that operations over Cartwright's more circuitous gateway routes were uneconomical and impractical, and that Cartwright would continue to forego their use. Thus, it is doubtful whether the Commission's decision to deny Cartwright's application had any measurable or appreciable impact on the quality of the human environment. Certainly such evidence supports the finding that there would be no significant impact.[18]

*The Mootness Question*

Cartwright presumably now uses the direct route in all instances where its circuitous gateway route adds 20 percent or less travel distance as compared to the direct route.

Turning to the more than 20 percent type of circuitous route, Cartwright contends the February, 1973 denial of its application for direct authority to operate over highly circuitous routes forced it to operate over highly circuitous gateway routes to the great detriment of the environment. Assuming that Cartwright would actually conduct such likely to be unprofitable operations and further assuming that those so conducted would cause some significant harm to the environment, the answer is that it is precisely those circuitous operations which have been positively proscribed by the new and now effective gateway elimination rules.[19] Under these new gateway rules which we judicially notice, Cartwright cannot use these highly circuitous gateways, and must obtain authority to transport directly or not transport. Cartwright may or may not be successful under the new gateway rules in obtaining direct route authority as a result of its pending applications which include the applications involved here. But successful or not, Cartwright will no longer be using the highly circuitous gateways in question in this suit. Hence, no present question or controversy of any appreciable consequence remains concerning any significant effect on human environment being possibly caused by defendant Commission's decision in this case not to grant the requested authority to Cartwright. Thus, Cartwright's N.E.P.A. contentions are now moot.

In accordance with the views above expressed, we find no merit in Cartwright's second contention, and further find that contention is now moot.

It is ordered that the relief sought by plaintiff be denied and that the complaint be dismissed.

18. The statutory test is whether the federal agency decision is a "major federal action significantly affecting the quality of the human environment". See 42 U.S.C. § 4331–4332.

19. These new gateway rules which are presumptively valid absent successful challenge have been resorted to by Cartwright to obtain the direct routes it desires. These new gateway rules which we take judicial notice of became effective on February 28, 1974. Cartwright's applications under them are currently pending. See Docket No. M.C. 88368 (Sub-No. 27G). We note that Cartwright under the new rules can continue the use of these gateways only until the I.C.C. acts on its applications concerning them. In view of the I.C.C.'s policy to expedite such action, as a practical matter any possible significant adverse effect on the quality of the human environment resulting from this small interval is so remote as in our judgment to moot Cartwright's N.E.P.A. contentions presented on this appeal.