809 F.2d 847
 258 U.S.App.D.C. 6
 INDEPENDENT U.S. TANKER OWNERS COMMITTEE, Appellant,
v.
Elizabeth H. DOLE, Secretary, U.S. Department of
Transportation, et al.
ALASKA BULK CARRIERS, INC., et al., Appellants,
v.
Elizabeth H. DOLE, Secretary, U.S. Department of
Transportation, et al.
INDEPENDENT U.S. TANKER OWNERS COMMITTEE, Seatrain Lines,
Inc., Appellant,
v.
Elizabeth H. DOLE, Secretary, U.S. Department of
Transportation, et al.
ALASKA BULK CARRIERS, INC., et al. Seatrain Lines, Inc., Appellant,
v.
Elizabeth H. DOLE, Secretary, U.S. Department of
Transportation, et al.
FIRST ATTRANSCO TANKER CORP., et al.
v.
SEATRAIN LINES, INC., Appellant, Elizabeth H. Dole,
Secretary, U.S. Department of Transportation, et al.
OVERSEAS SHIPBUILDING GROUP, INC., Seatrain Lines, Inc., Appellant,
v.
Elizabeth H. DOLE, Secretary, U.S. Department of
Transportation, et al.
OVERSEAS SHIPBUILDING GROUP, INC., Appellant,
v.
Elizabeth H. DOLE, Secretary, U.S. Department of
Transportation, et al.
FIRST ATTRANSCO TANKER CORP., et al., Appellants,
v.
Elizabeth H. DOLE, Secretary, U.S. Department of
Transportation, et al.
 Nos. 85-6068, 85-6069, 85-6134 to 85-6138 and 85-6163.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 10, 1986.
Decided Jan. 16, 1987.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action Nos. 85-01555, 85-01740, 85-01752 and 85-1771).
 Joseph A. Klausner, with whom Allan A. Tuttle, Washington, D.C., was on brief for appellant, Independent U.S. Tanker Owners Committee in Nos. 85-6068 and 86-6134.
 Amy Loeserman Klein, with whom William E. Cohen and Marc A. Bernstein, New York City, were on brief for appellants, First Attransco Tanker Corp., et al. in Nos. 85-6136 and 85-6163.
 Daniel P. Levitt, with whom Richard J. Wertheimer, Washington, D.C., was on brief for appellant, Overseas Shipbuilding Group, Inc. in No. 85-6138.
 Robert J. Blackwell, Anne E. Mickey, Jeffrey R. Masi and Linda L. Martin, Washington, D.C., were on brief for appellant, Alaska Bulk Carriers, Inc., et al. in No. 85-6069.
 William E. McDaniels, Kevin T. Baine and Jonathan Blank, Washington, D.C., were on brief for appellant, Seatrain Lines, Inc. in Nos. 85-6134, 85-6135, 85-6136 and 85-6137.
 Kenneth N. Weinstein, Deputy Asst. Gen. Counsel for Litigation, Dept. of Transp., with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, was on brief for appellees, Secretary of Transp., et al. in Nos. 85-6068, et al. Michael Kimmel and Robert S. Greenspan, Attys., Dept. of Justice, Washington, D.C., entered appearances for appellees.
 Roy G. Bowman and Richard H. Saltsman, Washington, D.C., were on brief for appellee, American Petrofina Inc. in Nos. 85-6068, et al.
 Michael Joseph, Mark P. Schlefer, Thomas L. Mills and Donald M. Squires, Washington, D.C., were on brief for appellees, Atlantic Richfield Co., et al. in Nos. 85-6068, et al.
 Before EDWARDS and BORK, Circuit Judges, and SWYGERT,* Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge BORK.
 BORK, Circuit Judge:
 
 
 1
 These consolidated cases are before us on appeal from a decision of the district court, 620 F.Supp. 1289 (1985), which sustained the validity of a rule promulgated by the Secretary of Transportation. Appellants challenge the rule as exceeding the Secretary's statutory authority and as arbitrary and capricious agency action; they also raise a battery of specific procedural objections to the manner in which the rule was promulgated. We find that the Secretary was well within her statutory authority in promulgating the rule, but that she failed to provide an adequate account of how the rule serves the objectives set out in the governing statute, the Merchant Marine Act of 1936, ch. 858, 49 Stat. 1985 (codified as amended at 46 U.S.C. Secs. 1101-1295g (1982)).
 
 I.
 
 2
 The rulemaking that gives rise to this case is the latest of numerous attempts by the Congress, the Maritime Administration, and the Department of Transportation to address the recurrent problems of the United States merchant marine fleet. The American fleet has had great difficulty competing in foreign commerce. American ships typically have higher construction and operating costs than their foreign competitors, not only because they typically must meet more stringent environmental and safety standards, but also because foreign ships often are subsidized and otherwise assisted by their own governments. Congress confronted these problems in 1936 and authorized the United States government to pay up to half the construction costs of American ships that will operate in foreign commerce. 46 U.S.C. Secs. 1151-1152 (1982). In addition, Congress authorized the government to subsidize the operating costs of these ships where necessary to meet foreign competition. Id. Secs. 1171-1172. Despite these provisions, American ships have continued to fare poorly against their competitors in foreign commerce.
 
 
 3
 Merchant ships that operate in the domestic shipping market do not receive these government subsidies. They are protected from the rigors of foreign competition, however, by the Jones Act, which requires all cargo transported between points in the United States to be carried on ships built in the United States, registered in the United States, and owned by American citizens. 46 U.S.C. Sec. 883 (1982).[1] They are also protected from having to compete against any of the ships that have received construction subsidies or operating subsidies from the government, except in a few specific and very limited instances.[2] Since the Trans-Alaska Pipeline opened in 1977, however, the domestic fleet has been unable to satisfy the great new demand for large tankers to carry Alaskan oil to other points in the country. The Maritime Administration has responded to this situation by invoking its statutory authority to allow certain subsidized ships to operate in the domestic market for up to six months in a given year if the ships repay a proportional share of the construction subsidy that they have received. 46 C.F.R. Part 250 (1984). Yet this step has only partly solved the problem.
 
 
 4
 The rule at issue in this case permitted tanker vessels built with the assistance of a federal construction-differential subsidy, which had been barred from competing in domestic trade on account of that subsidy, to undertake domestic operations if they agreed to repay the unamortized portion of the subsidy plus interest during a period that began on June 6, 1985, and closed one year later. See Construction-Differential Subsidy Repayment; Total Payment Policy, 50 Fed.Reg. 19,170 (1985) (codified at 46 C.F.R. Sec. 276.3 (1985)) (hereafter the "payback rule"). This rule addressed problems in both the foreign and domestic markets by providing an opportunity for ships that are not competitive in foreign commerce to enter the domestic market where the demand for their services has increased, but only by agreeing to relinquish their financial advantage over unsubsidized ships. The Maritime Administration has considered proposals for individual ships to repay their subsidies at least since 1964. In 1977, several owners of unsubsidized ships challenged the Administration's approval of repayment by one vessel in particular. The Supreme Court upheld the government's authority to approve subsidy repayment in exchange for permission to enter the domestic market. See Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980). Shortly thereafter, the Administration established an interim rule that extended this authorization to undertake domestic shipping, upon repayment of the full subsidy plus interest, to a limited class of large tankers whose owners demonstrated "exceptional circumstances" of dismal prospects in foreign commerce to justify the application of the rule. See 45 Fed.Reg. 68,393 (1980). The interim rule was challenged, and this court invalidated it, finding that although the Administration had statutory authority to promulgate the rule, it had acted arbitrarily and capriciously by providing an inadequate discussion of the basis and purpose of the rule. See Independent U.S. Tanker Owners Comm. v. Lewis, 690 F.2d 908, 918-20 (D.C.Cir.1982). At that point, the Secretary of Transportation proposed the payback rule. This rule is similar to the earlier proposed interim rule except that it covers all tankers and does not require tankers to make any showing of "exceptional circumstances" to qualify for the benefits of subsidy repayment.
 
 II.
 
 5
 Appellants initially question the Secretary's statutory authority to promulgate the payback rule. In Seatrain, however, the Supreme Court expressly recognized the government's authority under the Merchant Marine Act to approve the repayment of a ship's construction subsidy in return for the lifting of restrictions on domestic operations by that ship. 444 U.S. at 588, 100 S.Ct. at 809. Although in Seatrain the subsidy repayments were granted on an individualized basis and on a showing of exigent circumstances that justified the need for the government's action, the Court did not rely on either of these facts. Instead, the Court rested its conclusion on "the Secretary's broad contracting powers and discretion to administer the Act," especially the power to approve measures that "directly further the general goals of the Act." Id. In particular, the Court stressed the difference between a permanent release from the foreign-trade-only requirement, which requires a vessel to repay its subsidy before it can enter the domestic market, and a temporary release that might render a subsidized ship "capable of taking advantage of every shift in trade and profitability, skimming the cream and leaving what remains to those less mobile." Id. The Court stated that a temporary release would be very problematic, but a permanent release was not, at least insofar as it was conditioned on "full repayment" of the subsidy so as to confer no "windfall." Id. at 589 & n. 31, 100 S.Ct. at 810 & n. 31.
 
 
 6
 The payback rule satisfies these criteria and thus its promulgation falls within the Secretary's statutory authority under the Merchant Marine Act. See 46 U.S.C. Secs. 1151-1156 (1982); see also Independent U.S. Tanker Owners Comm., 690 F.2d at 917-18 (finding the earlier interim rule to be in harmony with the statutory mandate of the Merchant Marine Act). Indeed, this rule comes much closer to satisfying the Court's concern about "cream-skimming" in the domestic market by subsidized ships than did the Maritime Administration's previous response to the problem, undertaken pursuant to specific congressional authorization, which was to allow certain subsidized ships to operate in the domestic market for up to six months in a given year if they agree to repay a proportional share of their subsidy. See id. Sec. 1156; 46 C.F.R. Part 250 (1984).[3]
 
 III.
 
 7
 Appellants contend that even if the Secretary acted within her statutory authority in promulgating the payback rule, it should be invalidated because it is the product of agency action that was "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1982). In particular, appellants contend that the Secretary failed to provide a sufficiently reasoned discussion of why this rule was adopted and alternatives were rejected in light of the purposes of the Merchant Marine Act, which are the very purposes Congress intended the Secretary to serve when it gave her "broad" discretion to administer the Act. See 46 U.S.C. Sec. 1151 (1982); Seatrain, 444 U.S. at 588, 100 S.Ct. at 809-10.
 
 
 8
 It is unfortunate that, once more, we must agree with this contention. This court vacated the previous interim rule because the government "failed completely to fulfill its obligations" to set out an adequate statement of basis and purpose for the rule. Independent U.S. Tanker Owners Comm., 690 F.2d at 919. Now, four years later, we must vacate a similar rule on similar grounds.
 
 
 9
 Under the Administrative Procedure Act, when an agency initiates a rulemaking that the governing statute does not require to be undertaken "on the record," the agency is nonetheless bound to comply with the requirements for "notice and comment" rulemaking set out in 5 U.S.C. Sec. 553 (1982). See, e.g., United States v. Florida East Coast Ry., 410 U.S. 224, 234-41, 93 S.Ct. 810, 815-19, 35 L.Ed.2d 223 (1973). One requirement is that after the agency considers the comments presented by the participating parties, it "shall incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. Sec. 553(c). This statement need not be an exhaustive, detailed account of every aspect of the rulemaking proceedings; it is not meant to be the more elaborate document, complete with findings of fact and conclusions of law, that is required in an on-the-record rulemaking. See id. Sec. 557(c). On the other hand, this court has cautioned against "an overly literal reading of the statutory terms 'concise' and 'general'.... [which] must be accommodated to the realities of judicial scrutiny." Automotive Parts & Accessories Ass'n v. Boyd, 407 F.2d 330, 338 (D.C.Cir.1968). At the least, such a statement should indicate the major issues of policy that were raised in the proceedings and explain why the agency decided to respond to these issues as it did, particularly in light of the statutory objectives that the rule must serve. See National Wildlife Fed'n v. Costle, 629 F.2d 118, 134 (D.C.Cir.1980); Automotive Parts, 407 F.2d at 338; see also S.Doc. No. 248, 79th Cong., 2d Sess. 20 (1946) ("The statement of the 'basis and purpose' of rules issued will vary with the rule, but in any case should be fully explanatory of the complete factual and legal basis as well as the object or objects sought.").
 
 
 10
 In Seatrain, the Supreme Court indicated that Congress gave the government broad power to implement the Merchant Marine Act so that the government could take steps that "directly further the general goals of the Act." 444 U.S. at 558, 100 S.Ct. at 809. Those objectives are to foster the development and encourage the maintenance of an American merchant marine, in both foreign and domestic commerce, that is:
 
 
 11
 (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States, insofar as may be practicable, (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel, and (e) supplemented by efficient facilities for shipbuilding and ship repair.
 
 
 12
 46 U.S.C. Sec. 1101 (1982).
 
 
 13
 The Secretary's statement of basis and purpose fails to give an adequate account of how the payback rule serves these objectives and why alternative measures were rejected in light of them. The Secretary's treatment of these objectives, and of the concerns raised about them in the comment proceedings, is cursory at best. For example, concerns about whether this rule meets the statutory objective of maintaining an American merchant marine "sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce" are met with the statement: "The Department believes that the [rule] will benefit the U.S. Merchant Marine." 50 Fed.Reg. 19,170, 19,173 (1985). Her discussion continues further, but it hardly improves:
 
 
 14
 Although it is true, as many commenters pointed out, that some tankers will be forced out of service by more efficient operators, the industry should be more competitive and efficient in the future, especially since some of the most efficient tankers in the U.S. flag fleet would be fully utilized.... Overall, the industry should be left in a healthier, more viable condition.
 
 
 15
 Id. at 19,173-74. On the more dubious proposition that the fleet will remain able to carry "a substantial portion" of foreign commerce, the Secretary candidly acknowledges that "the final rule merely recognizes the existing condition of the U.S. tanker fleet. There currently exist few foreign trade employment opportunities for those vessels and the prospects for future employment in the foreign trade are far from bright." Id. at 19,174. Though this statement strongly suggests the view that this rule will hasten an American retreat from carriage of foreign commerce, the Secretary surprisingly asserts that the fleet will remain "more than adequate to carry an appropriate share of the U.S. foreign oil commerce if such opportunities should arise." Id. This remark is hard to fathom. If there is currently little hope for the employment of American vessels in foreign trade, then the payback rule will permit the total size of the American fleet to follow its natural tendency to decrease toward the level required by the domestic market. Under present conditions, therefore, the rule will make it impossible to retain a fleet that can carry all domestic traffic and "a substantial portion" of foreign traffic "at all times," which is explicitly set out as an objective in section (a) of the statute.
 
 
 16
 The Secretary's response to concerns about the rule's effects on the fleet as a naval auxiliary, to take another example, is similarly unsatisfying. The Navy warned that the projected loss under this rule of "handy-sized" tankers might have adverse implications for national security. The Secretary brushes aside this comment by stating her belief that "the outlook for these old, small product tankers is poor regardless of whether or not this rule is promulgated because of their age and the decline of the U.S. products trade." Id. She also claims that other non-fleet ships could fill in the gap, id., even though this observation may not help to satisfy the statutory objective that the fleet itself should constitute "a naval and military auxiliary in time of war or national emergency." 46 U.S.C. Sec. 1101(b) (1982).
 
 
 17
 Rather than providing a more extensive discussion of the Merchant Marine Act's objectives, the Secretary chooses to rely on other policies in defending the rule. She identifies some of the "most important" reasons for the rule as being "economic efficiency," "use of underemployed resources," "increased competition," and "deregulation." 50 Fed.Reg. at 19,172. As she later elaborates: "It is the Department's position that the competitive forces of the market, rather than government regulation, should be relied upon, whenever feasible, to allocate transportation capacity and resources in the domestic trade. This rule reflects that position." Id. at 19,175. The central thrust of her approach, quite obviously, is to subject the merchant marine fleet to the discipline of the free market. Thus she finds it significant that the rule will leave the industry "in a healthier, more viable condition," id. at 19,174, and she finds it permissible that the condition of the fleet should depend on what economic opportunities become available in the world market. See id. This policy may well be defensible, yet it is not among the objectives specified in the Act, and if the Secretary has decided that it is implicit in or compatible with the statutory objectives, it would be useful for her to explain this decision somewhat more fully. She has failed to do so. The closest she comes is the conclusory statement that "it would not be appropriate to let the various program objectives reflected in the Act stand in the way of achieving the Act's broader policy mandates, including that of promoting a more competitive and efficient merchant fleet." Id. It may, however, be entirely appropriate for the Act's objectives to stand in the way of the payback rule, and perhaps to favor other alternatives, unless the Secretary can offer a fuller and more persuasive explanation for her view that the "broader policy mandates" of the Act include the promotion of a "more competitive and efficient merchant fleet."[4]
 
 
 18
 The Secretary's failure to link the policies served by this rule to the objectives set out in the Merchant Marine Act is particularly problematic because she does not explain in the statement of basis and purpose why she rejects proposed alternatives to the payback rule. One can find this explanation in the Regulatory Impact Analysis, Joint Appendix ("J.A.") at 1049, where the Secretary considers and rejects at least a half-dozen other suggested measures. Once again, however, her account focuses on non-statutory criteria that favor this rule, such as lower transportation costs, collateral fiscal benefits, and more "efficient" use of the fleet. J.A. at 1089, 1093. She admits that the rule "has a number of adverse impacts," including "the displacement of about 13 tankers ... most of which are militarily useful handy-sized tankers, loss of employment opportunities for about 800 seamen, and the possible default on several government loans," id. at 1093, problems that impinge on the statutory objectives and that might be avoided under some of the alternative measures. See, e.g., id. at 1091-92 (describing effects of "full-time permissions" option, "status quo" option, and "eliminate permissions" option).
 
 
 19
 In exercising her decisionmaking authority, the Secretary is certainly free to consider factors that are not mentioned explicitly in the governing statute, yet she is not free to substitute new goals in place of the statutory objectives without explaining how these actions are consistent with her authority under the statute. Her failure to link these non-statutory criteria with Congress' stated objectives in the Act thus makes it impossible for us to uphold the Secretary's decision to reject other measures and adopt this rule in response to the current problems of the merchant marine fleet. Her reliance on these non-statutory criteria is consistently a key point in her justifications for adopting this rule. In order to defend this action as "reasoned decisionmaking," the Secretary must spell out in more detail how her decision to adopt this rule and reject alternative measures by relying on policies of competition and deregulation can be squared with the statutory objectives that Congress specified as the primary guidelines for administrative action in this area. We take no position on whether these policies can be squared with the Act. But in the absence of any such discussion, this court can only conclude that her action is "arbitrary, capricious, ... or not otherwise in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1982). See also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 412-13, 416, 91 S.Ct. 814, 821-22, 823-24, 28 L.Ed.2d 136 (1971) (choice made by the agency must be "in accordance with law" as it can be understood in light of the statutory indicia).[5]
 
 IV.
 
 20
 We therefore conclude that the Secretary violated section 553(c) of the Administrative Procedure Act by adopting this rule. In fashioning a remedy for an agency's failure to present an adequate statement of basis and purpose, this court may either remand for specific procedures to cure the deficiency without vacating the rule, see, e.g., National Nutritional Foods Ass'n v. Weinberger, 512 F.2d 688, 701, 703-04 (2d Cir.), cert. denied, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975), or it may vacate the rule, thus requiring the agency to initiate another rulemaking proceeding if it would seek to confront the problem anew. See, e.g., Tabor v. Joint Bd. for Enrollment of Actuaries, 566 F.2d 705, 710-12 (D.C.Cir.1977). In this case, we vacate the rule because the Secretary's omissions are quite serious and raise considerable doubt about which of the proposed alternatives would best serve the objectives set out in the Merchant Marine Act. Yet we exercise our power to withhold issuance of our mandate until July 16, 1987, to avoid further disruptions in the domestic market and to allow the Secretary to undertake further proceedings to address the problems of the merchant marine trade. See Fed.R.App.P. 41(a). As of that date, the present rule will be vacated and conditions returned to the status quo ante, before the payback rule took effect, subject of course to any further action that may have been taken in the interim.
 
 
 21
 So ordered.
 
 
 
 *
 Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (1982)
 
 
 [1]
 Congress has also established a loan guarantee program to assist the financing of domestic ships. 46 U.S.C. Secs. 1271-1276 (1982)
 
 
 [2]
 A subsidized ship is not permitted to operate in domestic commerce except in a few limited circumstances, such as on the first or last leg of an overseas voyage if the owner repays a prorated portion of the original subsidy, or upon the Secretary of Transportation's determination that an exemption is necessary or appropriate to carry out the purposes of the Merchant Marine Act, although the latter exception does not allow a subsidized ship to operate in the domestic trade for more than six months in a given year. 46 U.S.C. Sec. 1156 (1982)
 
 
 [3]
 In the Notice of Proposed Rulemaking, the Secretary identified facts that might be sufficient to establish the kind of exceptional circumstances that were touched on in Seatrain as justifying subsidy repayment. See 444 U.S. at 577, 100 S.Ct. at 803-04. In particular, she noted that American tankers operating in foreign commerce "have not been financially successful," largely because of recent events that have been "financially devastating for the world tanker market." 48 Fed.Reg. 4408 (1983). Yet we do not hold that these exceptional circumstances are a sine qua non to the Secretary's statutory authority to adopt this rule, given her "broad contracting powers and discretion to administer the Act." Seatrain, 444 U.S. at 588, 100 S.Ct. at 809. As long as the rule consists of a permanent release from restrictions upon full repayment of the subsidy plus interest, it is within the Secretary's authority under the Merchant Marine Act
 
 
 [4]
 It may be, of course, that present conditions in the world shipping market make it impossible for the Secretary to find a way to meet all of the statutory objectives. If this is the problem, she should discuss it frankly and directly when she considers which measures to adopt in light of the objectives explicitly set out in the Act
 
 
 [5]
 The grounds of our decision make it unnecessary to discuss the array of more specific procedural objections that appellants have made to this rulemaking. The district court found each of those objections to be without merit, but we take no position on the correctness of those findings