INDEPENDENT U.S. TANKER
OWNERS COMMITTEE, et al.

v.

Samuel K. SKINNER, in his capacity as
Secretary of the United States Depart-
ment of Transportation, et al.

Appeal of AMERICAN PETROFINA,
INCORPORATED.

Nos. 88–5313, 88–5314, 88–5317, 88–5318,
88–5319, 88–5320 and 88–5324.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 16, 1989.

Decided Aug. 22, 1989.

Richard A. Olderman, Atty., U.S. Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen. at the time the brief was filed, Jay B. Stephens, U.S. Atty., and Leonard Schaitman, Atty., U.S. Dept. of Justice, Washington, D.C., were on the brief, for federal appellants. Michael Kimmel, Atty., U.S. Dept. of Justice, Washington, D.C., also entered an appearance for federal appellants in Nos. 88–5319 and 88–5320.

A. Stephen Hut, Jr., with whom Patrick J. Carome, Raymond B. Ludwiszewski, Michael Joseph, and Thomas L. Mills, Washington, D.C., were on the brief, for appellants/intervenors Atlantic Richfield Co. and SPC Shipping, Inc.

Roy G. Bowman, Richard H. Saltsman, and Daniel Joseph, Washington, D.C., were on the brief for appellant American Petrofina, Inc. R. Bruce McLean, Washington, D.C., also entered an appearance for appellant American Petrofina, Inc.

William E. McDaniels and Joseph A. Klausner, Washington, D.C., with whom Daniel P. Levitt, New York City, Allan A. Tuttle, Michael D. Esch, Robert J. Blackwell, Anne E. Mickey, and Kevin T. Baine, Washington, D.C., were on the joint brief, for appellees.

Robert H. Loeffler, Washington, D.C., entered an appearance for State of Alaska, appellant in No. 88–5324 and appellee in No. 88–5313.

Before BUCKLEY and WILLIAMS, Circuit Judges, and GEORGE H. REVERCOMB,* U.S. District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Under the Merchant Marine Act, the Department of Transportation may provide construction subsidies to vessels, but the subsidized vessels, with certain exceptions, may not operate domestically. The rule under review reaffirms an earlier one that allowed three tankers to repay their construction subsidies in return for permission to ship domestically. The challenged rule was issued and made immediately effective less than one month before Congress passed an appropriations rider that barred the use of appropriated funds to promulgate or implement such subsidy repayment agreements.

Appellee tanker owners argue that the rider renders the rule null and void both because Congress intended the rider to apply retroactively and because it prevents the Department's Maritime Administration from taking the further actions they claim to be necessary before the rule is fully implemented. Appellees also claim that the regulation is procedurally defective.

The district court accepted these arguments or variations of them and vacated the rule. We hold that Congress' appropriations rider applies prospectively only and does not reach the challenged rule because it is self-implementing. We also conclude that the procedural challenges are without merit. We therefore reverse.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

## I. BACKGROUND

The Merchant Marine Act of 1936 ("Act"), 46 U.S.C.App. §§ 1101 *et seq.* (1982), was enacted, in part, to place American merchant vessels operating in foreign trade on a more equal footing with foreign-built and manned vessels. To this end, the Act authorizes the Secretary of Transportation ("Secretary") to subsidize construction costs for ships built in American shipyards on the condition that vessels receiving such subsidies "shall be operated exclusively in foreign trade, or on a round-the-world voyage." *Id.* §§ 1151 & 1156. Congress, however, made certain exceptions to this rule. For example, with the Secretary's approval, a vessel financed through a "construction-differential subsidy" ("CDS") may operate domestically for a maximum of six months per year provided that the vessel repays a *pro rata* share of the subsidy. *Id.* § 1156.

The agency with immediate administrative responsibility over the merchant marine is the Maritime Administration ("MarAd"). *See* 49 C.F.R. § 1.4(j)(1) (1987). MarAd was originally located within the Department of Commerce, but was transferred to the Department of Transportation ("DOT" or "Department") in August 1981. *See* 46 U.S.C.App. § 1601 (1982). Authority over specific aspects of the CDS program has been assigned to a three-member Maritime Subsidy Board located within MarAd. 49 C.F.R. § 1.4(k).

This case involves the latest in a series of attempts by successive administrations to permit certain very large crude oil carriers ("VLCCs") to repay their subsidies in return for permission to operate domestically full-time. These efforts were prompted, first, by a determination that the vessels could no longer compete in foreign commerce as a result of the world oversupply of tankers that had arisen since 1970, and second, by the need, following the completion of the Alaskan pipeline, for an increase in domestic tanker capacity to carry Alaskan oil to Panama where it is transshipped to Atlantic and Gulf Coast ports. *See* 52 Fed.Reg. 23,522.

Thus in the late 1970's, the Secretary of Commerce entered into subsidy repayment arrangements on a case-by-case basis. His authority to do so was challenged, and, in *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 597, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980), the Supreme Court held "that the Act empowers the Secretary to approve full-repayment/permanent-release transactions."

On October 15, 1980, the Secretary of Commerce published and made immediately effective an interim rule that limited the full CDS repayment option to tankers over a certain weight and provided that the Secretary would only accept repayment in "exceptional circumstances" after a determination that the vessels had little prospect for viable employment in foreign trade over an extended period. 45 Fed.Reg. 68,393, 68,-394 (1980). On November 13, 1980, MarAd approved repayment for the VLCC BAY RIDGE. Shortly thereafter, the Independent U.S. Tanker Owners Committee ("ITOC") challenged the interim rule as well as the approval of the subsidy repayment by the BAY RIDGE. In *Independent U.S. Tanker Owners Committee v. Lewis*, 690 F.2d 908, 918–20 (D.C.Cir.1982) ("*ITOC I*"), we upheld the challenge after finding that the agency had failed to provide an adequate "general statement of the [rule's] basis and purpose" as required by section 553(c) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(c). Nevertheless, we allowed the BAY RIDGE to continue operating in domestic commerce. *Id.* at 931.

Following *ITOC I*, the Secretary of Transportation, who had by then acquired jurisdiction over shipping matters, issued a new regulation providing that for a one-year period beginning June 6, 1985, any CDS tanker could enter into a repayment transaction. 50 Fed.Reg. 19,170, 19,178 (1985) ("1985 rule"). During this period, three additional VLCCs—the ARCO INDEPENDENCE, ARCO SPIRIT, and BROOKLYN—took advantage of the rule and repaid in excess of $100 million in subsidies and interest. *See* 52 Fed.Reg. 23,522, 23,-524 (1987).

ITOC challenged the 1985 rule and, in *Independent U.S. Tanker Owners Com-*

*mittee v. Dole,* 809 F.2d 847, 854 (D.C.Cir. 1987) (*"ITOC II"*), we held that DOT had once again failed to provide an adequate statement of basis and purpose. We vacated the rule but withheld issuance of our mandate until July 16, 1987 "to avoid further disruptions in the domestic market [by permitting the VLCCs to continue in domestic commerce *pro tem*] and to allow the Secretary to undertake further proceedings to address the problems of the merchant marine trade." *Id.* at 855.

After our decision in *ITOC II,* MarAd initiated an informal rulemaking and, on June 22, 1987, published the final rule ("1987 rule") that is at issue here. The rule (in which the Secretary concurred) provides in pertinent part:

> The Maritime Administration reaffirms the allowance of the irreversible total repayment of unamortized construction-differential subsidy (CDS), with interest and rescission permanently of the domestic trading restrictions related to the grant of CDS for tankers of any deadweight tonnage for applications approved between June 6, 1985 and June 5, 1986, in accordance with the terms and conditions of paragraph (b) of this section [specifying methods of computing interest, etc.]. The approved applications were for the ARCO INDEPENDENCE, ARCO SPIRIT and BROOKLYN.

52 Fed.Reg. 23,522, 23,536 (June 22, 1987). The Secretary made the rule effective immediately upon publication, invoking the "good cause" exception to the thirty-day waiting period between issuance and effectiveness required by section 553(d) of the APA, 5 U.S.C. § 553(d) (1982). *Id.*

Meanwhile, Congress had begun work on a rider to an appropriations bill that was designed to bar CDS repayment arrangements. On July 11, 1987, the President signed the Supplemental Appropriations Act of 1987 ("Appropriations Act") which provides (at section 505) that none of the appropriated funds "shall be used to propose, promulgate, or implement any rule or regulation" with respect to the repayment of subsidies in order to relieve CDS vessels from their commitment to foreign commerce. Supplemental Appropriations Act, Pub.L. No. 100–71, § 505, 101 Stat. 391, 471 (1987) ("section 505").

ITOC and certain tanker owners successfully challenged the 1987 rule in the U.S. District Court for the District of Columbia. The court ordered the rule vacated on a finding that Congress had intended to bar the promulgation of a CDS repayment rule after the date of our *ITOC II* decision, January 16, 1987. The court also concluded that it was improper for MarAd to issue the regulation when it knew that Congress was at work on section 505. Finally, the court found the regulation procedurally defective for two reasons: first, MarAd did not have good cause to waive the thirty-day waiting period; and second, the rule was arbitrary and capricious because the agency had failed to provide an adequate statement of its basis and purpose. *Independent U.S. Tanker Owners Committee v. Burnley,* Civ. Action Nos. 87–1685 & 87–2102, 1988 WL 48522 (D.D.C. Apr. 29, 1988) ("Mem.Op.").

Appellees reassert an additional claim not reached by the district court, namely, that MarAd had no authority to issue the rule because that responsibility had been delegated to the Maritime Subsidy Board. As appellees failed to present this objection during the rulemaking process, however, they are precluded from doing so at this time. *See Northside Sanitary Landfill, Inc. v. Thomas,* 849 F.2d 1516, 1521 (D.C. Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989).

## II. DISCUSSION

### A. Procedural Issues

We begin with a discussion of the procedural issues because if, as the district court found, the 1987 rule was invalid *ab initio,* we will not need to consider the effect of section 505 of the Appropriations Act.

### 1. *Waiver of Thirty–Day Waiting Period*

As an alternative ground for striking down the 1987 rule, the district court held that the agency had violated section 553(d)

of the APA by failing to observe the statutorily mandated thirty-day waiting period between the date of the 1987 rule's publication and the date of its effectiveness. Mem.Op. at 22–25. Section 553(d) provides:

> The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—
>
> (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
>
> (2) interpretative rules and statements of policy; or
>
> (3) as otherwise provided by the agency for good cause found and published with the rule.

5 U.S.C. § 553(d) (1982).

In the notice accompanying the publication of the rule in the June 22, 1987 Federal Register, the Maritime Administrator invoked the "good cause" exception provided by subsection (d)(3) ("good cause exception") to the thirty-day waiting period required by section 553(d) by explaining that "[t]he rule must be made effective prior to the [*ITOC II*] imposed deadline of July 16, 1987 in order to avoid disruptions in the domestic trade." 52 Fed.Reg. at 23,536. The Administrator also stated that because the three ships affected by the rule had been operating in the domestic trade for more than a year, the public did not need time to prepare for their permanent entry into domestic service. *Id.* In the proceedings before the district court, the government also claimed exemption under subsection (d)(1) ("(d)(1) exception") which excepts a substantive rule that "relieves a restriction" because the 1987 rule lifted the ban on the three vessels' participation in domestic shipping.

■ The district court rejected the government's claim of a (d)(1) exception because it had not been asserted in the agency's published notice, characterizing it as a *post hoc* rationalization that an agency may not advance for the first time on appeal. Mem.Op. at 22–23. The court then dismissed the claim to a good cause exception on the ground that as the agency could and should have delayed the rule's effec-

tive date until July 15, one day prior to the expiration of the *ITOC II* stay, the agency had failed to demonstrate good cause for the June 22 effective date. *Id.* at 23–25.

We need not determine whether the good cause exception is applicable in this instance because we find that the agency's alternative claim under the (d)(1) exception is valid. Despite the district court's characterization, the Secretary's invocation of the exception is not a *post hoc* rationalization. We are dealing here not with the reasoning by which an agency seeks to justify its actions, but with a pure question of law: Was the 1987 rule subject to the thirty-day waiting requirement? The answer is straightforward. The section 553(d) waiting period does not apply to "a substantive rule ... which relieves a restriction," 5 U.S.C. § 553(d)(1); as the MarAd regulation is such a rule, it is not subject to the requirement.

As the statute itself relieves MarAd of any obligation to defer the effectiveness of its rule, it is under no obligation to make an explicit claim of the right to do so. *Cf. Hou Ching Chow v. Attorney General,* 362 F.Supp. 1288, 1292 (D.D.C.1973) (rejecting agency's proffered reason for dispensing with the thirty-day waiting period but holding *sua sponte* that the challenged rule granted an exemption within the meaning of subsection (d)(1)). By way of contrast, the good cause exception must be claimed because the statute explicitly requires agencies to assert affirmatively their exemption "for good cause found *and published with the rule.*" 5 U.S.C. § 553(d)(3) (emphasis added). In sum, the good cause exception must be invoked and justified; the (d)(1) exception applies automatically.

Appellees contended, at oral argument, that the (d)(1) exception did not apply in instances, such as the present one, where a thirty-day waiting period might benefit third parties. Although they were unable to supply specific references, appellees claimed that the APA's legislative history and the *Attorney General's Manual on the Administrative Procedure Act* supported their position. Having consulted both sources, we can find nothing in the

former that touches on this question, while the latter actually contradicts appellees' position:

The fact that an interested person may object to such issuance, amendment, or repeal of a rule does not change the character of the rule as being one "granting or recognizing exemption or relieving restriction", thereby exempting it from the thirty-day requirement.

*Attorney General's Manual on the Administrative Procedure Act* 37 (1947).

### 2. *The Agency's Explanation of the Rule*

■ The district court also found the 1987 regulation to be arbitrary and capricious, and therefore unlawful under 5 U.S.C. § 706(2)(A) (1982), because it found MarAd's explanation to be inconsistent with the evidence before the agency and the objectives of the Merchant Marine Act. Mem.Op. at 13–18. We respectfully disagree.

In *ITOC II*, we held that the statement of basis and purpose for the 1985 rule was inadequate because the Secretary had failed "to provide a sufficiently reasoned discussion of why [the 1985] rule was adopted and alternatives were rejected in light of the policies of the Merchant Marine Act." 809 F.2d at 851. In her explanation of the 1985 rule, the Secretary had relied on policies, such as economic efficiency, use of underemployed resources, increased competition, and deregulation, that are not explicitly listed among the Merchant Marine Act's stated goals. At the same time, she failed to explain why they were "implicit in or compatible with the statutory objectives." *Id.* at 853.

The preamble of the Act states that its purpose is to

further the development and maintenance of an adequate and well-balanced American merchant marine, to promote the commerce of the United States, [and] to aid in the national defense....

Pub.L. No. 74–835, 49 Stat. 1985 (1936). Section 101 of the Act provides:

It is necessary for the national defense and development of its foreign and domestic commerce that the United States shall have a merchant marine (a) sufficient to carry its domestic water-borne commerce and a substantial portion of the water-borne export and import foreign commerce of the United States and to provide shipping service essential for maintaining the flow of such domestic and foreign water-borne commerce at all times, (b) capable of serving as a naval and military auxiliary in time of war or national emergency, (c) owned and operated under the United States flag by citizens of the United States, insofar as may be practicable, (d) composed of the best-equipped, safest, and most suitable types of vessels, constructed in the United States and manned with a trained and efficient citizen personnel, and (e) supplemented by efficient facilities for shipbuilding and ship repair. It is declared to be the policy of the United States to foster the development and encourage the maintenance of such a merchant marine.

46 U.S.C.App. § 1101 (1982).

The Administrator asserts that the 1987 rule promotes two statutory objectives. First, by allowing the VLCC's to remain in the domestic fleet, the rule promotes the goal of ensuring that the "most suitable types of vessels" will make up the merchant marine. He defines suitability to mean "suitability of particular vessels for the U.S. commerce, and suitability of vessels to serve as naval auxiliaries." 52 Fed. Reg. at 23,525. Second, the Administrator maintains that the rule ensures that the U.S. merchant marine will be a "well-balanced" fleet

composed of a mix of vessels that are suitable for serving particular trades. While VLCCs are more suitable than smaller, handy-sized tankers for the long-haul, high volume crude oil trades, e.g., Valdez–Panama, handy-sized tankers ... are better suited than VLCCs for U.S. coastwise trades.

*Id.* at 23,527.

Appellees argue that the VLCCs will not increase the fleet's suitability because other tankers are newer, better designed, saf-

er, faster, and more fuel efficient. These arguments, however, do not undermine the premise behind the Administrator's conclusion—namely, that the VLCCs feature economies of scale that make them particularly appropriate for the long Alaska–to–Panama trip. *See, e.g., id.* at 23,526 ("In port, costs per ton increase with ship size; at sea, however, costs per ton decline with ship size.")

Appellees also contest the agency's finding that the tankers will contribute to a "well-balanced" fleet. They argue that the Alaska–Panama route will soon expire because of a decrease in the production of Alaskan oil and because of the advent of a new pipeline from California to Texas that will obviate the need for shipments from Alaska to Texas through Panama. The Administrator acknowledges that demand on the Alaska–Panama route might decrease in the future (*id.* at 23,530) but nevertheless concludes that the rule's benefits outweigh its detriments.

In *ITOC II*, we complained that the agency had given only cursory treatment to the rule's effect on domestic trade. 809 F.2d at 852. This deficiency has been corrected. First, the Administrator explores the problem of excessive tonnage and concludes that the rule will not exacerbate it. On the contrary, he finds that the presence of the three VLCCs in the domestic fleet "has stabilized the trade by allowing permanent entry of a limited number of suitable tankers into the [Alaskan–Panama] trade instead of the uncertainty of the six-month waivers for an uncertain number of VLCCs." 52 Fed.Reg. at 23,530. Second, the Administrator argues that if the VLCCs left the domestic trade, the increased use of smaller ships with higher costs per ton-mile would result in higher rates for crude oil transportation, with a consequent diversion to pipelines that would reduce overall tanker employment. *Id.*

In *ITOC II*, we also found that the agency had not dealt in sufficient detail with the rule's effect on the goal of ensuring that the U.S. merchant marine be capable of carrying "a substantial portion of the wa-

ter-borne export and import foreign commerce of the United States." *See* 809 F.2d at 852–53. In his discussion of the rule, the Administrator asserts that in view of the world oversupply of tankers and the higher operating costs experienced by U.S. flag vessels, the likely result of the removal of the VLCCs from domestic trade is that they would be scrapped rather than used in international shipping. 52 Fed. Reg. at 23,529.

Appellees contend that MarAd should have responded to this situation by providing the three VLCCs with "operating-differential subsidies," *see* 46 U.S.C.App. § 1173(a), rather than transferring them to the domestic fleet. The agency rejected this alternative because, among other things, the price "would be exorbitant ... approximately $5 million annually per ship.... There would be no incentive for efficient operation, and the Government would become the guarantor of profitable operation." 52 Fed.Reg. at 23,523.

One could argue that this cost is the price we should be ready to pay to achieve the explicit congressional objective of a U.S. merchant fleet that is capable of meeting domestic needs as well as carrying "a substantial portion" of U.S. water-borne import and export commerce "at all times." 46 U.S.C.App. § 1101. The Secretary, however, has been vested with the authority to determine when operational subsidies should be provided, not the courts.

In *ITOC II*, we found that the agency had not satisfactorily addressed the 1985 rule's impact on the Act's goal of maintaining a merchant marine capable of serving as a naval auxiliary, and noted a Navy warning that the rule might result in the loss of certain "handy-sized" tankers. 809 F.2d at 853. Appellees argue that the 1987 rule will undermine national defense because the VLCCs will drive out smaller ships that would prove more useful to the Navy in the event of war. *Id.* The Navy, however, has expressed its support for the 1987 rule, Admin.Rec. at 1289 (letter dated June 10, 1987 from Dep't of the Navy to MarAd), and certified the three VLCCs as militarily useful. 52 Fed.Reg. at 23,526.

Under these circumstances, we cannot conclude that MarAd has failed to consider the rule's impact on national security.

The Administrator addresses the 1987 rule's impact on two of the Act's other goals. He acknowledges that retaining the VLCCs in the domestic trade will result in a net loss of up to 300 jobs for U.S. seamen. *Id.* at 23,531. On the other hand, he rejects appellees' contention that the 1987 rule will hurt the U.S. shipbuilding business by depriving it of the opportunity to build new ships, arguing that retaining the three VLCCs in the domestic trade is unlikely to have a "significant adverse effect" on U.S. shipyards. He asserts that it is doubtful that any company would build new VLCCs because of their high construction costs and the probable decline in the volume of oil that will be shipped from Alaska to Panama in the 1990's. Nor would shippers build smaller tankers as substitutes for the VLCCs because they would be unsuitable for the Alaska–Panama route. The Administrator maintains that if the rule is set aside, other CDS-built tankers will likely fill the resulting shortage by applying for temporary permission to ship domestically, as permitted under the Act. *Id.* at 23,527–28.

Finally, in *ITOC II*, we criticized the Secretary because her explanation for the rejection of alternatives to the 1985 rule focused on non-statutory criteria that favored the rule, while admitting that the rule created "problems that impinge on the statutory objectives and that might be avoided under some of the alternative measures." 809 F.2d at 854. In his statement in support of the present rule, the Administrator examines each of the alternatives in terms of the Act's objectives and persuasively argues that because of the suitability of the VLCCs for the Alaska–Panama route, the rule better serves the Act's overall goals. 52 Fed.Reg. at 23,534–35.

We conclude that the Administrator has cured the shortcomings we identified in *ITOC II* and provided a sufficient statement of basis and purpose for the 1987 rule. As he concedes, the rule will result in some reduction in employment. While

this is unfortunate, this court has previously acknowledged that the Department may not be able to pursue all of the Act's goals simultaneously:

> It may be, of course, that present conditions in the world shipping market make it impossible for the Secretary to find a way to meet all of the statutory objectives. If this is the problem, she should discuss it frankly and directly when she considers which measures to adopt in light of the objectives explicitly set out in the Act.

*ITOC II,* 809 F.2d at 854 n. 4. In the case before us, the agency has exhibited the required candor. While some of its judgments are no doubt controversial, Congress has entrusted them to the agency, and not the courts. We also find that while others might interpret the evidence in different ways, the Administrator's conclusions have adequate support in the record. We therefore find that MarAd acted neither arbitrarily nor capriciously, but in full accord with its legal responsibilities and the purposes of the Act.

### 3. *Preemption of Legislative Action*

■ The district court suggests that the 1987 rule must be set aside because MarAd had advance notice of congressional opposition to CDS repayments and, therefore, should have deferred publication until Congress had had the opportunity to make its will known:

> Rather than heed the command of Congress, the agency chose to outrace Congress by issuing a final rule before Congress could complete the legislative process. The agency's action was nothing more than an attempt to subvert the will of Congress, and thus, cannot stand.

Mem.Op. at 5–6.

We offer two comments. First, while the agency was fully aware that there was strong congressional opposition to the rule, it was by no means clear that the final version of the appropriations bill would contain section 505 because the Senate had already been persuaded to drop the section from its version of the Supplemental Appropriations Act. Second, however unseemly a race to preempt congressional

action may at times appear, we know of no principle that holds that the executive branch must stay its hand whenever it learns that the legislative branch may change the law. We say this notwithstanding the district court's reference to our decision in *National Treasury Employees Union v. Devine*, 733 F.2d 114 (D.C.Cir. 1984). Mem.Op. at 8–11.

*Devine* is readily distinguishable. That case involved controversial changes in federal personnel practices that the Office of Personnel Management ("OPM") had first proposed on March 30, 1983 and then incorporated in modified form in proposed regulations that it issued on July 14, 1983. One month later, on August 15, Congress adopted an appropriations rider similar to section 505 that forbade the commitment or expenditure of any funds to implement OPM's March 30 or July 14 proposals before October 15, 1983. 733 F.2d at 115. Immediately following the expiration of the rider, OPM published a somewhat modified form of the same regulations, with an effective date of November 25, 1983. In the meantime, on November 12, Congress passed another funding resolution again barring OPM from committing or expending any funds to implement or administer the regulations that would take effect thirteen days later. *Id.* at 115–16.

We found clear indications in the legislative history that Congress "wished to prevent the effectuation of major changes in personnel management policies before it had an adequate opportunity to consider possible legislative solutions." *Id.* at 120. We also stated, in *dicta*, that "even assuming *arguendo* that the regulations could be implemented workably without further participation by the OPM, it is evident that Congress intended to prevent" the implementation of the proposed regulations. *Id.* at 120. Nevertheless, *Devine* is inapposite because we found that OPM's final regulations were incapable of implementation not because they had been invalidated by congressional action, but because OPM, which "had to play a critical and continuing role in their implementation, administration, and enforcement," had been denied the

funds required to put them into effect. *Id.* at 119. By contrast, MarAd need not take any further action before the 1987 rule becomes fully operational. *See* discussion below at 597.

**B. Section 505**

■ Section 505 of the Appropriations Act reads as follows:

> None of the funds appropriated or made available by this or any other Act or otherwise appropriated or made available to the Secretary of Transportation or the Maritime Administrator for purposes of administering the Merchant Marine Act, 1936, as amended (46 U.S.C. 1101 et seq.), shall be used by the United States Department of Transportation or the United States Maritime Administration to propose, promulgate, or implement any rule or regulation, or, with regard to vessels which repaid subsidy pursuant to the rule promulgated by the Secretary May 3, 1985 and vacated by Order of the U.S. Court of Appeals for the D.C. Circuit January 16, 1987, conduct any adjudicatory or other regulatory proceeding, execute or perform any contract, or participate in any judicial action with respect to the repayment of construction differential subsidy for the permanent release of vessels from the restrictions in section 506 of the Merchant Marine Act, 1936, as amended: *Provided,* That such funds may be used to the extent such expenditure relates to a rule which conforms to statutory standards hereafter enacted by Congress.

The district court held that section 505 voided the 1987 rule because

> Congress' choice of language indicates an intent to bar the agency from promulgating any CDS repayment rule as of the date of the Court of Appeals' decision, January 16, 1987 until or unless it acted later.

Mem.Op. at 7. As Congress acted almost six months following our decision in *ITOC II* and nineteen days after publication of the 1987 rule, the court's holding requires that the section be given retrospective effect. We therefore evaluate the court's

interpretation in light of the principle of statutory construction providing that

a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."

*United States v. Security Indus. Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982) (citation omitted) (ellipsis in original).

We find it difficult to reconcile the district court's interpretation with the plain language and stated purpose of section 505. Although it refers to the *ITOC II* decision, section 505 applies to any CDS repayment arrangement, and it operates exclusively as a restriction on the *expenditure* of appropriated funds. Such a prohibition is inherently prospective as the language does not purport to reach expenditures already made. Moreover, the provision that no funds *"shall be"* used for the enumerated purposes speaks only to future expenditures. *See* 1A C. Sands, *Sutherland Statutory Construction* 693 (4th ed. 1985) ("It is obvious that the word 'shall,' in itself, cannot 'include' the past.").

Appellees offer two alternative reasons why section 505 must be given retrospective effect despite the prospective thrust of its language. First, they contend that interpreting section 505 as allowing the 1987 rule to stand would render it a nullity because the Department had indicated before section 505 was enacted that it would not accept repayment from any CDS vessels other than the three that were the subject of the 1987 rule. Therefore, appellees argue, as the section applies exclusively to the three VLCCs, we must reject a construction that would give the section prospective effect only because that would deprive Congress' action of meaning. We find this argument unconvincing for several reasons: It presupposes that the statutory language is susceptible to an alternative construction, which we find it not to be; it ignores the fact (as appellees themselves call to our attention in their appeal to legislative history) that a number of

members of Congress believed that section 505 would nullify the rule through the prospective denial of funds for its implementation (*see, e.g.,* 134 Cong.Rec. S9142 (daily ed. July 1, 1987) (remarks of Sen. Hollings); 134 Cong.Rec. H2792 (daily ed. July 8, 1987) (remarks of Rep. Carr); 134 Cong. Rec. S10866 (daily ed. July 29, 1987) (remarks of Sen. Mikulski)); and finally, section 505 could well have been intended to guard against the possibility that the Department might change its mind and enter into repayment arrangements with additional CDS vessels.

Second, appellees argue that section 505's legislative history evidences Congress' intention that the appropriations measure apply retroactively to bar the 1987 regulation. That argument also founders on the stubborn fact that the statute, with its use of the verb "shall" and its focus on expenditures, cannot be read to apply retroactively. There being no ambiguity to be resolved, an appeal to legislative history is inappropriate. *See, e.g., Garcia v. United States,* 469 U.S. 70, 76 n. 3, 105 S.Ct. 479, 483 n. 3, 83 L.Ed.2d 472 (1984) (" 'Resort to legislative history is only justified where the face of the Act is inescapably ambiguous.' ") (citation omitted); *Overseas Education Ass'n v. FLRA,* 876 F.2d 960 (D.C. Cir.1989) (Buckley, J., concurring). While some proponents of section 505 may well have intended it to prevent MarAd from adopting the 1987 rule, we are nonetheless bound by its language, which accurately reflects Congress' decision to rely on the appropriations process to achieve its policy objectives. Restrictions on expenditures of appropriated funds are inherently prospective, and we have no authority to give them retroactive effect.

■ We now reach appellees' argument that section 505 effectively nullifies the 1987 rule because it bars the use of appropriated funds to implement it. According to appellees, MarAd must take two further actions before the 1987 rule becomes operative: It must amend the vessels' CDS contracts to delete the restrictions on domestic trading, and it must respond to the appellees' petitions for rehearing. MarAd as-

serts, however, and we agree, that because payment from the three VLCCs has already been received and because the tankers have operated domestically since 1985, the rule affirms the right of the ARCO INDEPENDENCE, ARCO SPIRIT, and BROOKLYN to remain in domestic commerce, and their contracts need not be amended to confirm this right.

Nor are we persuaded by appellees' remaining argument, which is based on a regulation that provides that "[t]he [Maritime] Administration's decision or order shall be stayed pending resolution by the Administration of a petition for reopening...." 46 C.F.R. § 201.171 (1988). According to them, this regulation prevents the 1987 rule from going into effect until the agency responds to the petitions for reopening filed by ITOC and others. Section 201.171, however, only applies in instances where the agency has held a *formal* hearing. *Delta Steamship Lines, Inc.*, 22 S.S.R. 542, 543 (MSB 1983). As the 1987 rule was promulgated pursuant to an *informal* rulemaking, the regulation does not apply. *See* 52 Fed.Reg. 12,199 (1987) (initiating notice and comment rulemaking).

In sum, we find that section 505 neither retrospectively voids the 1987 rule nor prevents it from becoming fully operational. As appellees have amply demonstrated, interested members of Congress were fully aware of the rule's existence before the conference committee resolved the differences between the Senate and House versions of the Supplemental Appropriations Act. Had the conferees wished to vacate the 1987 rule, they could have done so simply by ordering its revocation. As they did not, our task is to apply the language they agreed upon and that Congress enacted into law.

## III. CONCLUSION

Section 505 applies prospectively only, and because the Maritime Administrator is not required to take any further action to implement the 1987 rule, it remains in effect. Nor is the rule procedurally flawed. The Administrator was under no obligation to provide a thirty-day waiting period be-

tween issuance and effectiveness, and we find his statement of its basis and purpose to be sufficient. Accordingly, we reverse the judgment entered in the district court.

*So ordered.*