**OVERSEAS SHIPHOLDING GROUP, INC., Plaintiff,**

v.

**Samuel SKINNER, et al., Defendants.**

**Civ. No. 87–2102 (CRR).**

United States District Court, District of Columbia.

June 28, 1991.

Allan A. Tuttle and Michael D. Esch, with Joseph A. Klausner of Patton, Boggs & Blow, on the brief, Washington, D.C., for plaintiff Overseas Shipholding Group, Inc.

Sandra M. Schraibman and Mona B. Alderson, Asst. U.S. Attys., with Stuart M. Gerson, Asst. Atty. Gen., and Jay B. Stephens, U.S. Atty. for District of Columbia, on the brief, for Federal defendants.

A. Stephen Hut and Stephen M. Cutler of Wilmer, Cutler & Pickering, Washington, D.C., with Michael Joseph, Thomas L. Mills and E. Alex Blanton of Dyer, Ellis, Joseph & Mills, on the brief, Washington, D.C., for Atlantic Richfield Co. and BP Oil Shipping Co., U.S.A.

Daniel Joseph and Jonathan S. Spaeth of Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., with Roy G. Bowman and Richard H. Saltsman of Verner, Lipfert, Bernhard, McPherson & Hand, on the brief, Washington, D.C., for American Petrofina, Inc.

## OPINION

CHARLES R. RICHEY, District Judge.

## I. INTRODUCTION

This is yet another segment of the labyrinth of litigation surrounding a final rule issued by the Department of Transportation and the Maritime Administration ("MARAD") allowing four very large crude tankers ("VLCCs") to repay construction-differential subsidies (CDS) in exchange for the right to operate in the domestic trade on a permanent basis [1]. The Court now considers the parties' cross-motions for summary judgment with regard to MAR-AD's compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.* Upon careful consideration of the pleadings, the administrative record and the applicable law, the Court grants the motion for summary judgment filed by the federal defendants and grants the motion for summary judgment by the defendant-intervenors, Atlantic Richfield Company, BP Oil Shipping Company, USA, and American Petrofina, Inc. In addition, the Court denies the motion of the Plaintiff Overseas Shipholding Group, Inc.

## II. BACKGROUND

To enhance the ability of United States merchant vessels to compete in foreign commerce, the Merchant Marine Act of 1936, 46 U.S.C.App. §§ 1101 *et seq.*, authorizes the Secretary of Transportation to subsidize the construction costs for ships built in this country. The construction-differential subsidy program (CDS) presumes that the vessels receiving the CDS are "operated exclusively in the foreign trade, or on around-the-world voyage." *Id.* §§ 1151, 1156. Unfortunately, however, these efforts to bolster American competitiveness in foreign shipping faltered in the late–1970s. Due to an oversupply of tankers and reduced demand for foreign oil, many of the subsidized VLCCs were not fully employed. *See* 52 Fed.Reg. at 23,522.

While the foreign oil trade was depressed, the domestic trade was booming due to the Alaskan pipeline. The demand for American-flag tonnage in the domestic oil trade had increased to the point that ships in the domestic trade had insufficient tonnage to meet the demand. *Id.* MAR-AD planned to alleviate the shortage by permitting CDS-built VLCCs to enter the domestic trade for a temporary period not to exceed six months in any twelve-month period, under the condition that the vessel owner repay a pro rata share of the CDS. *See* 46 U.S.C.App. § 1156; 46 C.F.R. § 250

---

**1.** *See* Construction–Differential Subsidy Repayment, 52 Fed.Reg. 23,522 (1987).

*et seq.* The agency's authority to "approve full-repayment/permanent release transactions" was upheld by the Supreme Court in *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980).

In 1980, the Secretary of Commerce issued an interim rule which was effective immediately and limited the full repayment option to tankers over a certain weight. Under this interim rule, the Secretary could accept repayment under "exceptional circumstances" after a determination that the vessel was unlikely to be employed in the foreign trade. *See* 54 Fed.Reg. 68,393 (1980). This rule was upended by the Court of Appeals, however, because the agency failed to provide an adequate general statement of the rule's basis and purpose as required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(c). *Independent U.S. Tanker Owners Committee v. Lewis,* 690 F.2d 908, 918–20 (D.C.Cir. 1982) ("ITOC I"). The VLCC *Bay Ridge,* which repaid its CDS under this provision, was permitted to remain in the domestic commerce. *Id.* at 931.

The Secretary of Transportation then issued a revised rule in 1985 providing that, for a one-year period, any tanker could repay the CDS in return for domestic shipping privileges. *See* 50 Fed.Reg. 19,170 (1985) (hereinafter, "1985 Rule"). Pursuant to the 1985 Rule, three VLCCs, the *Arco Independence, Arco Spirit,* and *Brooklyn,* repaid their CDS in exchange for the right to enter domestic commerce. *See* 52 Fed.Reg. 23,522 (1987). As part of the rulemaking process, the agency performed an Environmental Assessment ("EA"), as required by NEPA and 40 C.F.R. § 1500 *et seq.,* and found that the proposed rule would have no significant impact on the human environment. *See* Administrative Record at 93–160 (hereinafter, "AR"). The District Court upheld the rule, and summarily dismissed Plaintiff OSG's claims that the 1985 Rule was enacted in violation of NEPA. *Independent U.S. Tanker Owners Committee v. Dole,* 620 F.Supp. 1289, 1294 n. 10 (D.D.C.1985) (Jackson, J.). The District Court was reversed on appeal for the agency's failure to

identify the basis and purpose of the rule as required by the APA. *Independent U.S. Tanker Owners Committee v. Dole,* 809 F.2d 847, 854 (D.C.Cir.1987) ("ITOC II"), *cert. denied sub nom., Atlantic Richfield Co. v. Independent U.S. Tanker Owners Committee,* 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987). The Court of Appeals did not reach the NEPA issue.

MARAD returned to the proverbial drawing board and, through informal rulemaking, propounded another repayment rule in 1987. *See* 52 Fed.Reg. 23,522 (1987) (hereinafter, "1987 Rule"). In contrast to the 1985 Rule, the 1987 Rule would allow repayment of CDS subsidies only by those vessels already operating in the permanent domestic trade pursuant to prior approvals that had been invalidated by the courts. *Id.* at 23,524. In other words, only four vessels were impacted: *Bay Ridge, Arco Independence, Arco Spirit,* and *Brooklyn. Id.* at 23,536. During the course of the 1987 rulemaking, MARAD prepared another EA, as required by NEPA and the applicable regulations, and again determined that the proposed rule would have no significant impact on the human environment. *See* AR at 1387–1420. This Court invalidated the rule on numerous procedural grounds, and did not reach the merits of the Plaintiff OSG's renewed NEPA claim. *Independent Tanker Owners Committee v. Burnley,* Civ. Action Nos. 87–1685 and 87–2102, 1988 WL 48522 (D.D.C. April 29, 1988). The Court of Appeals reversed, finding that the 1987 Rule was properly enacted and had an adequate statement of basis and purpose. *See Independent Tanker Owners Committee v. Skinner,* 884 F.2d 587 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990) ("ITOC III"). The Court of Appeals did not reach the merits of OSG's NEPA claim. However, the Court of Appeals granted OSG's motion to modify the mandate and remanded the case for resolution of the NEPA claims. *See Independent U.S. Tanker Owners Committee v. Skinner,* 901 F.2d 1116 (D.C.Cir.1990). Thus, this Court now considers on cross-motions for summary judgment whether

MARAD issued the 1987 Rule in compliance with NEPA.

## III. ANALYSIS

The parties' claims on the cross-motions for summary judgment revolve around three issues: (1) does OSG have standing to sue under NEPA; (2) does Judge Jackson's dismissal of OSG's NEPA claims in ITOC II bind this Court as a matter of stare decisis or law of the case; and (3) does MARAD's finding that the 1987 Rule creates no significant impact on the human environment constitute an arbitrary, capricious or irrational decision?

In order to grant a motion for summary judgment, the moving party must demonstrate that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. *See* F.R. Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The parties have identified no genuine issues of material fact precluding summary judgment. Moreover, the parties have not suggested that the Court undertake fact-finding to supplement the administrative record. Accordingly, the administrative record governs the Court's consideration of whether MARAD's finding of no significant impact ("FONSI") in its Environmental Assessment ("EA") was arbitrary, capricious or irrational. *See also Camp v. Pitts,* 411 U.S. 138, 141, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (*citing Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (courts' fact-finding in review of informal agency action generally confined to administrative record)).

Because the rule in question was enacted in 1987, the Court must confine its review of the full administrative record to the material before the agency at the time the decision was made. "To review more than the information before the Secretary at the time she made her decision risks our requiring administrators to be prescient or allowing them to take advantage of *post hoc* rationalizations (citation omitted)." *Walter O. Boswell Memorial Hosp. v.*

*Heckler,* 749 F.2d 788, 792 (D.C.Cir.1984). However, the Court must review the agency's decision under the lens of current legal precedent. *See, e.g., Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969).

### A. Plaintiff OSG has Standing to Assert a NEPA Claim

To have standing, the plaintiff "must establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Federation,* — U.S. ——, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (*citing Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 396–97, 107 S.Ct. 750, 755–756, 93 L.Ed.2d 757 (1987)). The "'creation of a risk that serious environmental impacts will be overlooked' is sufficient to establish the injury necessary for standing under NEPA, 'provided that this injury is alleged by a plaintiff that ... may be expected to suffer whatever environmental [consequences] the decision may have.'" *City of Los Angeles v. NHTSA,* 912 F.2d 478, 483 (D.C.Cir.1990) (*citing City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975)). The party seeking review of the agency's decision must "set forth specific facts (even though they may be controverted by the Government)" showing that the party has suffered a cognizable injury under the statute. *Lujan,* 110 S.Ct. at 3186–87.

In this action, OSG has alleged that the 1987 Rule created a risk of environmental injury "in that the air and water environment in which plaintiff's vessels, crews and other personnel operate would be made substantially more hazardous." Complaint at ¶ 36. OSG also alleged that it would suffer economic injury, such as fouling the hull, damaging the condensers and contaminating the ballast tanks, "as a consequence of having to operate its vessels in a polluted environment." *Id.* Both the federal defendants and the defendant-intervenors contend that these injuries are not within NEPA's zone of interests. The de-

fendants further argue that, even if these injuries are within NEPA's purview, the alleged injuries are too attenuated to provide a basis for standing. These challenges to OSG's ability to sue under NEPA lack merit.

### 1. OSG has Standing to Sue on Behalf of its Employees

■ OSG, on behalf of its employees, has standing to sue under NEPA. As explained above, OSG challenges the rulemaking because, in its view, enacting the rule without performing a full Environmental Impact Statement ("EIS") creates a risk of air and water pollution in the areas in which the company and its employees do business. *See* Complaint ¶ 36. This allegation of harm to the environment will suffice to bring an action under NEPA because the statute was intended to address issues of air and water pollution.

In *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court established a three-part test for organizational standing. Under this test, an organization may sue on behalf of its members if: (1) its members would otherwise have standing; (2) the interests to be protected are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Id.* 97 S.Ct. at 2441. In this case, OSG's employees certainly have standing to challenge a rule which would make their working environment more polluted, and courts have accepted the corporate entity's ability to sue on this basis. *See, e.g., Duke City Lumber Co. v. Butz*, 382 F.Supp. 362, 374 (D.D.C. 1974), *aff'd*, 539 F.2d 220 (D.C.Cir.1976), *cert. denied sub nom., Duke City Lumber Co. v. Knebel*, 429 U.S. 1039, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977) (lumber company plaintiffs "have alleged an injury in fact, namely, damage to the environment in which they work and upon which they depend for their livelihood and continued maintenance of the quality of their lives"); *County of Josephine v. Watt*, 539 F.Supp. 696 (N.D.Cal.1982) (lumber company had sufficient injury to challenge rule due to occupational interest in lumbering areas); *Cartwright Van Lines, Inc. v. United States*, 400 F.Supp. 795 (W.D.Mo.1975), *aff'd*, 423 U.S. 1083, 96 S.Ct. 873, 47 L.Ed.2d 94 (1976) (trucking company's allegations that more circuitous trucking routes would injure environment in which they work was sufficient to sue under NEPA).

Moreover, the claim asserted and the relief requested do not require the presence of any individual employees. OSG does not seek monetary damages, *compare Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (disallowing organizational standing for monetary damages), and desires only to force the agency to conduct the analysis required by NEPA in order to prevent the enumerated environmental risks. *See International Union, UAW v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (granting standing where organization tests validity of agency interpretation of applicable law).

Finally, the interests which OSG seeks to protect are "germane" to the organization's purpose. In *Humane Soc. of the United States v. Hodel*, 840 F.2d 45, 58 (D.C.Cir.1988), the Court of Appeals explained that the germaneness requirement is "undemanding" and requires only "mere pertinence between litigation subject and organizational purpose." *See also American Insurance Association v. Selby*, 624 F.Supp. 267, 271 (D.D.C.1985) ("an association's litigation interests must be truly unrelated to its organizational interests before a court will declare that those interests are not germane"). Here, OSG seeks to maintain a safe and healthy working environment in which to sail its ships and crews. While environmental concerns are not the guiding purpose of the corporate organization, the goal of preserving a safe working environment in the waterways is certainly pertinent, if not necessary, to OSG's successful operation.

### 2. OSG has Standing to Sue in its Own Behalf

■ OSG may also sue under NEPA in its own right—independently of the interests of its employees—in order to redress

the injuries which may be sustained as a result of the alleged increase in air and water pollution. OSG has alleged that it will suffer injury to its vessels. In particular, OSG alleged that the increased risk of water pollution which would result from a major oil spill as well as the increased risk of a collision due to the permanent presence of the VLCCs in the trade could result in injuries such as fouling the hull and contaminating the ballast tanks. *See* Complaint at ¶ 36; Memorandum of Points and Authorities of Overseas Shipholding Group's Motion for Summary Judgment at 1. Provided that these injuries are reasonably foreseeable results of the 1987 Rule, *see* discussion, *infra*, at Section A.3., they qualify as environmental "effects" under the governing statute and regulations. *See* 40 C.F.R. § 1505.8 (" 'Effects' includes ... ecological, ... aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative"). *See, e.g., Port of Astoria v. Hodel,* 595 F.2d 467 (9th Cir. 1979) (permitting business entity to sue to protect against economic losses sustained due to proposed rule).

### 3. *OSG's Claims are not so Attenuated as to Deny Standing Under NEPA*

█ Next, the federal defendants claim that OSG's alleged injuries "are too general, speculative, and remote to satisfy the basic constitutional requirements for standing." *See* Memorandum of Points and Authorities in Support of Federal Defendants' Motion to Dismiss the NEPA Claim at 5 (hereinafter, "Fed. Def'ts Motion to Dismiss").[2] This argument does not convince the Court, however, because it assumes the accuracy of the agency's own conclusions and projections without giving the plaintiff the opportunity to demonstrate flaws in the agency's analysis. The argument also misconstrues the NEPA standing jurisprudence.

The agency acknowledges the risk of an oil spill, *see* AR at 1399 ("the potential for oil spill is of the greatest concern"), and the possible reconfiguration of tanker traffic in the future as a result of the 1987 Rule. *See* AR at 1417 (projecting that "more VLCCs and other large tankers [will] replace, where permitted by navigation channel depths, smaller tankers"). The parties disagree as to whether the agency has drawn the correct conclusions from the data collected in the EA process. According to the plaintiff's analysis, the reconfiguration of tanker traffic may result in an increased risk of a major spill due to the presence of the VLCCs in certain sea lanes and the need for increased lightering. The plaintiff may well be incorrect. However, the plaintiff certainly has the right to challenge the agency's decision-making process in the first instance. Whether OSG will ultimately prevail on the merits of the challenge is a question independent of its right to challenge the agency's failure to perform a full EIS.

█ Forcing a plaintiff to demonstrate "proof" of the alleged harm at the summary judgment stage of a NEPA case defies the statute's overriding informational and investigative purposes.

NEPA's purpose of ensuring well-informed government decisions and stimulating public comment on agency actions effectively lowers the threshold for establishing injury to informational interests. This approach appears to based on the premise that NEPA creates a right to information on the environmental effects of governmental actions; any infringement of that right constitutes a constitutionally cognizable injury, without further inquiry into causation or redressability.

*Competitive Enterprise Inst. v. NHTSA,* 901 F.2d 107, 123 (D.C.Cir.1990).[3] *See also City of Los Angeles v. NHTSA,* 912 F.2d

---

**2.** The defendant-intervenors have adopted the federal defendants' standing arguments. *See* Memorandum of Points and Authorities of Defendant–Intervenors in Support of the Dismissal of Plaintiff's Claim Under the National Environmental Policy Act at 7 n. 6.

**3.** Defendant-intervenors incorrectly assert that, because OSG is not engaged in "programmatic activity", it has no right to sue to enforce NEPA. *See* Defendant–Intervenor's Response to OSG's Motion for Summary Judgment at 13 n. 13. Nowhere is there a limitation that NEPA is available only to information-gathering groups

478, 492 (D.C.Cir.1990) ("The need to fully assess harm *before* a project is undertaken is a major justification for the broad test courts have laid down for NEPA standing.") (emphasis in original); *Public Citizen v. NHTSA*, 848 F.2d 256, 269 n. 2 (D.C.Cir.1988) (Silberman, J., dissenting on other grounds) (NEPA confers procedural right); *Committee for Auto Responsibility v. Solomon*, 603 F.2d 992, 999 (D.C.Cir. 1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980) (injuries alleged fairly traceable to GSA's failure to perform an EIS because EIS would have assessed the pollution effects, and then GSA could take steps to redress). *See generally* Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 259 (1988) (NEPA requires plaintiffs to make a "colorable claim that the actions may possibly affect her" because "[t]o require a greater showing ... would be to require, as a condition of bringing suit, that plaintiff show much of what she claims should be investigated").[4]

The defendants place great reliance on *Lujan v. National Wildlife Federation*, —— U.S. ——, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990), to show that the plaintiff must make more specific allegations of environmental harm. In *Lujan*, the plaintiffs alleged that the Bureau of Land Management's (BLM) land withdrawal renewal program, which opened up mining in 4,500 acres of a 2 million acre area, ran afoul of NEPA and adversely affected their recreational use and enjoyment of the land. The Court held that the plaintiffs had not stated sufficient facts to warrant standing because, in their affidavits, the plaintiffs claimed that they used lands "in the vicinity of" the affected area. *Id.* 110 S.Ct. at 3187–88. Thus, the affidavits only stated a general allegation of injury which was insufficient to survive a summary judgment motion. *Id.* This case differs markedly from *Lujan*, however. Here, there is no question that OSG uses the affected sea lanes, and would be aggrieved should there be an oil spill, collision or increased air pollution. OSG's allegations in the complaint are sufficiently specific to avoid the pitfalls of *Lujan*.

The defendants cannot rely on *Lujan* to support a broader argument that the plaintiff here must prove that the environmental injury *will* occur. The Court imposed no such requirement on the plaintiffs in the *Lujan* case. In fact, courts have not required plaintiffs to demonstrate the certainty of the alleged harm, and only require that the harm is a reasonably foreseeable consequence of the rule as promulgated. *See City of Los Angeles v. NHTSA*, 912 F.2d at 492; *Public Citizen v. NHTSA*, 848 F.2d at 263 (citing *International Ladies Garment Workers' Union v. Donovan*, 722 F.2d 795, 811 (D.C.Cir.1983) (party need not prove that 'the requested relief is *certain* to alleviate their injury' to have standing) (emphasis in original), *cert. denied*, 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984), and *Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979) (standing upheld despite prospect that appellant, even if successful in Supreme Court, might fail to achieve the ultimate relief he sought in the litigation). The plaintiff here meets its burden, as it is reasonably foreseeable that the rule may increase the risk of oil spills and may intensify pollution in certain sea lanes due to the changes in ship configuration brought about by the 1987 Rule.

4. *Given that OSG Alleges a Bona Fide Environmental Interest, Their Pecuniary Interests do not Preclude a NEPA Claim*

■ OSG's competitive interest in invalidating the 1987 Rule does not deny it the

---

such as the Sierra Club and state governments. As explained heretofore, OSG has an interest in seeing that the agency undertakes a full and complete study of the ramifications of the environmental effects of the proposed 1987 Rule. A private company's profit motive does not, *per se*, disqualify it from asserting a NEPA claim. *See also* discussion, *infra*, at Section III.A.4.

**4.** For the same reasons, the federal defendants' claim that OSG lacks standing because, "if OSG were to suffer damages as a result of an oil spill, it could and undoubtedly would seek damages after such a spill," lacks merit. Fed. Def'ts Opposition to Memorandum in Support of Overseas Shipholding Group's Motion for Summary Judgment at n. 1. OSG's ability to recover monetary damages *post facto* does not obviate the need for adequate factfinding by the agency to warn and to protect against an oil spill.

ability to sue under NEPA. The case of *Realty Income Trust v. Eckerd,* 564 F.2d 447 (D.C.Cir.1977), makes this point most directly. In that case, the plaintiff company owned two buildings in Jackson, Mississippi, which it rented to the federal government. The plaintiff challenged the GSA's decision to build a new federal office building, which would effectively destroy the plaintiff's tenant base, because the GSA did not file an environmental impact statement ("EIS"), as required by NEPA, prior to submitting the proposal for Congressional approval. In its complaint, the plaintiff alleged that the proposed new building would cause environmental injury due to its effect on "vehicular and pedestrian traffic." *Id.* at 452 n. 7. The Court of Appeals held that this allegation afforded the Realty Trust standing under NEPA.

> Certainly an allegation of injury to monetary interest alone may not bring a party within the zone of environmental interests as contemplated by NEPA for purposes of standing. But a party is not *precluded* from asserting cognizable injury to environmental values because his 'real' or 'obvious' interest may be viewed as monetary.

*Id.*

Courts should be reluctant to dissect a plaintiff's motivations for bringing a NEPA claim. "It is not part of [the courts'] function to weigh or proportion" conflicting monetary and environmental interests. *National Helium Corp. v. Morton,* 455 F.2d 650, 655 (10th Cir.1971). Rather, courts should deny standing to businesses asserting NEPA claims only when "the companies are motivated solely by protection of their own pecuniary interest *and* [ ] the public interest aspect is so infinitesimal that it ought to be disregarded altogether." *Id.* (emphasis added). If anything, failure to allow groups such as OSG to prosecute NEPA claims would rob the statute of much of its intended value because

> it surely does not square with the broad Congressional purpose in NEPA of assuring that environmental values would be adequately and pervasively considered in federal decision-making for private

parties who are not "pure of heart" to be excluded from vindicating the Act.

*Realty Income Trust,* 564 F.2d at 452–53.

Thus, even if OSG's motives are predominantly profit-based, they have alleged an injury to the environment worthy of the Court's scrutiny. Given the potential harm to the environment in the affected sea routes, OSG's claims are not primarily economic and do relate to a significant public interest in reducing air and water pollution. *See also Port of Astoria v. Hodel, supra* (allowing plaintiff radio station to sue where injury was effect on its ability to broadcast); *Chemical Leaman Tank Lines, Inc. v. United States,* 368 F.Supp. 925 (D.Del.1973) (despite overriding profit motive, company presented a sufficient ecological interest to sue based on alleged increase in air pollution resulting from ICC's order increasing number of carriers of waste commodities).

B. The Law of the Case Doctrine and Stare Decisis do not Prevent the Court From Considering OSG's NEPA Claim

■ OSG challenged the 1985 Rule on the basis of MARAD's failure to comply with NEPA. This claim was denied by the District Court in ITOC II. *See Independent U.S. Tanker Owners Committee v. Dole, supra,* 620 F.Supp. at 1294 n. 10. The Court of Appeals vacated the District Court's ruling in ITOC II on APA grounds and did not explicitly address the NEPA issue. *See Judgment,* No. 85–6068, *et al.,* January 16, 1987, Exhibit A, Reply Memorandum in Opposition to Federal Defendants' Motion to Dismiss Plaintiff's NEPA Claims. *See also Independent U.S. Tanker Owners Committee v. Dole, supra,* 809 F.2d at 854. Because the Court of Appeals in ITOC II did not address the NEPA claim, the defendant-intervenors claim that the District Court's denial of the NEPA claim in ITOC II should govern disposition of this action by virtue of either stare decisis or law of the case. According to the defendant-intervenors, this result should follow from the prior decision, *a fortiori,* because the 1985 Rule addressed all tankers and the 1987 Rule addresses a small subset of these same tankers.

These claims lack merit. First and foremost, it is hornbook law that the law of the case doctrine operates as a form of issue preclusion *within the same case. See* J. Friedenthal, M. Kane & A. Miller, *Civil Procedure* § 14.1, at 611 (1985) ("Stated most simply, law of the case refers to the principle that issues once decided in a case that occur in later stages of the same case are not to be redetermined"). This action, which deals with the 1987 Rule, is not the same as ITOC II for law of the case purposes. This is especially true when, as here, the parties assert a NEPA claim based upon an entirely separate *rulemaking process.* The fact that the rules themselves may be similar does not matter for these purposes. In other words, even if the rulemaking process in 1985 was flawed, this does not necessarily address whether the rulemaking process was flawed, for NEPA purposes, in 1987.

■ Likewise, the District Court's Opinion in ITOC II does not have an automatic stare decisis effect. Stare decisis will determine the resolution of the instant action only if the facts of ITOC II, particularly the procedures followed at the rulemaking stage, are sufficiently similar to this case. *See* 1B J. Moore, J. Lewis & T. Currier, *Moore's Federal Practice* ¶ 0.402[2], at 40–41 (2d ed. 1991).

■ More importantly, though, even assuming that ITOC II and ITOC III are part of the same case, the Court of Appeals' decision to recall its mandate and to direct this Court to consider the NEPA issue eviscerates the precedential effect of the District Court's opinion in ITOC II. The Court of Appeals in ITOC III had the power to reconsider the NEPA issue when reviewing this Court's Opinion after the remand because, by not addressing the NEPA claim in ITOC II, the Court of Appeals left the issue open for another appellate court to consider at a later stage of the case.

In the case in which the mandate of the appellate court does not address a particular issue, the appellate judgment, on this issue, does not establish the law of the case, and on appeal from the judg-

ment entered after remand, it may be reviewed by the appellate court.

*Moore's Federal Practice, supra,* at ¶ 0.404 [4.–3]. *See also* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 (1981). The Court of Appeals took just this opportunity and recalled and modified its mandate in ITOC III, requiring this Court to consider the NEPA claims. *See Independent U.S. Tanker Owners Committee v. Skinner,* 901 F.2d 1116 (D.C.Cir.1990). Thus, even if Judge Jackson's decision in ITOC II precluded this Court from resurrecting the NEPA issue on its own initiative, the Court of Appeals has *directed* this Court to undertake the inquiry. Accordingly, this Court adheres to the Court of Appeals' unequivocal Order of Remand which, in its own right, binds this Court via stare decisis and law of the case.

C.  MARAD Took a Hard Look at the Environmental Consequences of its Decision and Did Not Act Arbitrarily, Capriciously or in an Abuse of Discretion in Deciding to Forego the Preparation of an EIS

■ In order to ensure that agencies do not ignore the myriad of environmental interests in their decisionmaking processes, NEPA requires agencies to prepare an environmental impact statement ("EIS") for any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Agencies have the primary responsibility for determining whether the particular federal action poses a risk of significant impact to the human environment. *See, e.g., Sierra Club v. United States Dep't of Transp.,* 753 F.2d 120, 126 (D.C.Cir.1985). Pursuant to 40 C.F.R. § 1508.13, MARAD is not obligated to prepare an EIS if it makes a finding of no significant impact ("FONSI") after completing an environmental assessment ("EA"). OSG challenges the FONSI issued with respect to the 1987 Rule, and contends that the 1987 Rule is invalid for failure to prepare an EIS.

Courts review an agency's FONSI "to determine whether the agency considered the relevant factors in a rational way."

*Public Citizen v. NHTSA, supra*, 848 F.2d at 266. The standard of review articulated by the Court of Appeals in the *Public Citizen* case guides the consideration of OSG's claims here:

> [The] decision not to prepare an EIS can only be overturned if the decision was arbitrary, capricious or an abuse of discretion. Judicial review of an agency's finding of "no significant impact" is not, however, merely perfunctory[,] as the court must insure that the agency took a "hard look" at the environmental consequences of its decision.

*Id.* (citing *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C.Cir.1983)). The Court of Appeals has determined whether an agency has taken the requisite "hard look" on a case-by-case basis. For example, the Court of Appeals has overturned an agency's decision not to conduct an EIS when there has been a "complete failure to address a major environmental concern," *Public Citizen*, 848 F.2d at 266 (citing *Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 154 (D.C.Cir.1985)), or when the agency makes a "bald assertion" about the likely result of the proposal in question. *Public Citizen, supra* (citing *Natural Resources Defense Council v. Herrington*, 768 F.2d 1355, 1431 (D.C.Cir. 1985)).

This Court cannot "substitute [its] judgment for that of the agency as to the environmental consequences of its actions." *Public Citizen*, 848 F.2d at 267 (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 10, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1975)). Rather, the Court's "more limited role is to ensure, primarily, that no arguably significant impacts have been ignored." *Public Citizen*, 848 F.2d at 267 (*citing Sierra Club v. United States Dept. of Transp.*, 753 F.2d at 128). "Evaluating the 'impact' of those consequences on the 'quality of the human environment,' however, is 'left to the judgment of the agency'." *Public Citizen*, 848 F.2d at 128 (*citing Sierra Club*, 753 F.2d at 128).

The agency and the defendant-intervenors defend the decision to forego the preparation of an EIS. Defendants portray the 1987 Rule as a minor change in the status quo, only affecting the ownership status of vessels already in the domestic commerce under the temporary waiver program. The defendants claim that any change in the status quo will be a positive one, reducing the overall risk of an oil spill over the long run, because the larger VLCCs, able to carry more oil, will gradually bump the numerous smaller boats currently operating in the Alaska to Panama trade to other routes. The smaller boats will, in turn, bump other inefficient boats. The end result will be fewer oil-carrying boats and a reduction in the overall risk of an oil spill. *See* 52 Fed.Reg. at 23,532.

OSG, on the other hand, argues that MARAD's FONSI was an arbitrary, capricious and irrational decision on three grounds: (1) that MARAD chose an incorrect base year for purposes of its statistical evaluation of the effect of the 1987 Rule; (2) that MARAD incorrectly analyzed the effects of lightering which will result from the need for smaller boats to carry the excess VLCC tonnage into port due to certain draft and other weight-based limitations; and (3) that MARAD ignored the increased risk of catastrophic oil spills occasioned by the 1987 Rule and failed to compare the environmental impacts of a catastrophic spill by a VLCC with the impacts of spills by smaller tankers. The agency and the defendant-intervenor VLCC owners dispute each of these claims. The Court will address these claims in turn.

1. *Because the Rule Would Merely Continue the Status Quo, the Agency Correctly Found That the Subsidy Repayment Would Not Have a Significant Impact on the Environment*

Based upon the agency's review of the supply and demand patterns in the shipping industry, MARAD concluded that allowing the four VLCCs in question to repay their subsidies would have no significant impact on the environment. *See* 52 Fed.Reg. at 23,532 ("Moreover, the full time participation of these vessels in the ANS–Panama trade is consistent with experience in trade prior to the 1985 rule, in light of the former level of six month permissions.

Thus, there will be little if any change in environmental impacts as a result of this rule"). *See also* AR at 1393. In reaching this conclusion, MARAD determined that the Alaska–Panama VLCC shipping patterns would remain the same in the near-future, even without adopting the proposed 1987 Rule.

> It is unrealistic to assume that the demand for oil transport could be met by smaller vessels. It is more likely that CDS-built VLCCs would request and be allowed to enter the ANS trade on a temporary basis under waivers ... or that vessels in lay-up would be reactivated.

*See* AR at 1392.[5] MARAD also determined that "the distribution of tonnage would not change substantially if the four VLCCs are allowed to remain in the trade." 52 Fed. Reg. at 23,532.

OSG refutes this conclusion by pointing to the fact that there were fewer CDS VLCCs in the domestic trade in 1984. This isolated fact does not undermine the force of the agency's analysis, however. MARAD considered the 1984 data and concluded that the data for that year was not representative. According to MARAD's analysis, 1984 was an aberrational year in the shipping industry.

> More recent 1984 data were not used in the risk calculations because that was a[n a]typical year for ANS crude shipments. For the first time since 1977 there was [sic] virtually no CDS-built VLCCs in the trade. In addition, traffic distribution was unusually different because of the absence of VLCCs and the increased cost of transporting crude to Panama.

AR at 144. Clearly, MARAD took a "hard look" at the data for the shipping industry and the Court has no reason to reject the agency's considered judgment.

OSG also argues that MARAD is avoiding the preparation of an EIS by unfairly "bootstrapping" this Rule on the prior temporary waiver system. OSG claims that the agency should have prepared an EIS, at some unspecified point in the long history of the Merchant Marine Act, while the agency issued temporary domestic shipping waivers.[6] This claim does not convince the Court, however. The defendant-intervenors are correct to point out that OSG cannot challenge the failure to prepare an EIS for an entire set of agency actions. In *Lujan*, the Supreme Court refused to allow the respondent to challenge the 1,250 individual determinations made pursuant to the BLM's land withdrawal renewal regulations. Instead, the Court held that

> respondent cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or in the halls of Congress, where programmatic improvements are normally made. Under the terms of the APA, respondent must direct its attack against some particular "agency action" that causes it harm.

*Lujan, supra,* 110 S.Ct. at 3190. Likewise, by making this argument, OSG incorrectly attempts to unravel the series of temporary waivers granted by MARAD over a period of years, rather than focusing its challenge on the particular regulation in 1987 by which it has been aggrieved.

OSG implicitly suggests that MARAD should have compared the effects of the proposed 1987 Rule with the state-of-the-world prior to the time that the agency began to issue temporary waivers for CDS VLCCs. Had MARAD performed this analysis, OSG claims that there would have been a finding of significant impact. This claim fails, however. The agency correctly refused to extrapolate based upon a situation which no longer exists, and correctly evaluated the status quo at the time of the rulemaking with the state-of-the-world as it

---

5. In 1983, approximately six VLCCs entered the domestic trade under temporary six-month waivers. 52 Fed.Reg. at 23,522. The agency concluded that this level of temporary waiver activity "was the equivalent of three domestic VLCCs participating in the domestic trade on a full-time basis." *Id.*

6. MARAD approved approximately 37 applications submitted by VLCCs for six-month waivers to engage in the domestic commerce for the 1977 through 1987 period. 52 Fed.Reg. at 23,-522.

would exist if the 1987 Rule were adopted. Courts have instructed that this is the correct approach for FONSI purposes.

> [I]t is the environment as it is found contemporaneously with an agency's decision to embark upon an action which may change it, not the condition in which it may have been left before, which is the benchmark from which the alteration of the status quo is to be measured in assessing the significance of such action for NEPA purposes.

*National Resources Defense Council v. Vaughn,* 566 F.Supp. 1472, 1476 (D.D.C. 1983) (agency could not issue a FONSI for the reactivation of a nuclear power plant; the plant was currently inactive and fact that it was in operation 10 years ago is irrelevant for FONSI purposes). *See generally* D. Mandelker, *NEPA Law & Legislation,* § 8.50 (1990) (when a rule does not alter existing environmental conditions, courts uphold findings of no significant impact) (cases cited therein). In effect, the agency found that the proposed 1987 Rule would make permanent the current 1986 shipping pattern in which the four VLCCs in question were already operating. On this basis, the agency concluded that the Rule would have no significant impact.

Furthermore, the agency did not ignore any cumulatively significant impacts in contravention of 40 C.F.R. § 1508.27(b)(7). Environmental impact statements were prepared for all of the components of the shipping trade affected by the 1987 Rule, and these studies were consulted by the agency in preparing the EA for the 1987 Rule. Specifically, an EIS was prepared

when the VLCCs were constructed in 1973 and the CDS program was initiated. *See* U.S. Department of Commerce, Maritime Administration, *Final Environmental Impact Statement: Maritime Administration Construction Program,* 1973.[7] *See* AR 160 (listing other EISs relied upon by agency in preparing 1985 EA); *see also* AR 1388 (1987 EA updates data compiled for 1985 EA). Agencies are entitled to rely on such prior evaluations, provided that they update the conclusions as necessary. *See, e.g., Greenwood Utilities Comm'n v. Hodel,* 764 F.2d 1459, 1465 (11th Cir.1985) (when implementing a new power marketing scheme, agency was entitled to rely on data collected in EIS which was prepared when the hydroelectric projects were constructed). In this case, MARAD updated the prior 1985 EA and also prepared an assessment of any potential risks which the proposed 1987 Rule would spawn.

Also, the 1987 Rule does not establish any precedent for future action which would adversely impact the environment. The Rule only contemplates the continued presence of ships which are already active in the domestic commerce, and does not increase the number or size of ships in the trade.[8] *See* 52 Fed.Reg. at 23,522, 23,533; AR at 1388.

2. *The Agency Acted Within its Rightful Prerogative in Selecting 1983 as the Data Base, and OSG Cannot Complain Now of the Agency's Decision to Use This Data*

The plaintiff complains that MARAD erred in comparing 1986 shipping data with

---

**7.** OSG contends that this 1973 EIS is inadequate because it assumed that the vessels would be engaged only in the foreign trade. *See* OSG's Reply Memorandum in Opposition to Federal Defendants' Motion to Dismiss at 6 n. 4. This fact does not invalidate the study, however. The VLCCs' impact on the Alaska area was studied, as these ships would have to navigate the Alaska coastline regardless of their ultimate destination. Moreover, other studies evaluated the impact of the VLCCs' entry into domestic commerce. *See, e.g.,* U.S. Department of Commerce, *Final Environmental Impact Statement. Maritime Administration Title XI, Tank vessels Engaged in Domestic Trade,* 1978; U.S. Department of the Interior, *Final Environmental Impact Statement. Proposed Trans–Alaska Pipe-*

line, 1972; U.S. Department of State, *Final Environmental Impact Statement: New Panama Canal Treaties,* 1977; U.S. Department of Transportation, U.S. Coast Guard. *Final Environmental Impact Statement: LOOP Deepwater Port License Application,* 1976.

**8.** The Court expresses no opinion as to whether an increase in the number or size of VLCCs would warrant the preparation of an EIS. The only important issue for these purposes is that the proposed 1987 Rule does not alter the status quo in a significant way, and does not establish any far-reaching precedent worthy of the Court's concern.

the 1983 data in assessing the impact of not adopting the proposed 1987 Rule. The parties do not dispute that the 1986 data depicts what the shipping trade would look like if the 1987 Rule was adopted.[9] However, according to the plaintiff, MARAD should have compared 1986 data with data from 1984, a year in which only two VLCCs were in the domestic trade. This comparison would have allowed MARAD to witness the full impact of permitting the four VLCCs to enter the domestic trade on a permanent basis. At bottom, the plaintiff believes that the agency compared like with like and obfuscated the true effect of the 1987 Rule. *See* Plaintiff's OSG's Memorandum in Support for the Motion for Summary Judgment at 4–5. This claim falters on the merits, and also suffers from a fatal procedural defect.

OSG never challenged MARAD's use of the 1983 data during the administrative process. *See* Memorandum of Def't–Intervenor in Response to Plaintiff's Memorandum for Summary Judgment at 5–6 n. 6; Fed.Def'ts Opposition at 4 n. 2. *See* AR at 820–839.[10] Accordingly, the plaintiff should not be permitted to raise the issue at this late stage. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 552–53, 98 S.Ct. 1197, 1216–17, 55 L.Ed.2d 460 (1978); *Independent U.S. Tanker Owners Committee v. Skinner,* 884 F.2d 587, 590 (D.C.Cir.1989) ("ITOC III") (failure to raise MARAD's lack of authority to issue the rule during the rulemaking process precludes party from rais-

ing the issue on appeal) (and cases cited therein). Furthermore, the agency offers a reasonable explanation for using 1983 data in place of the more recent 1984 figures. *See* discussion, *supra,* in Section III.C.1.

3. *The Agency Considered the Likelihood of Increased Lightering and Did Not Act Arbitrarily, Capriciously or in an Abuse of Discretion in Determining That There Would be no Significant Adverse Environmental Impacts*

MARAD concluded that the "CDS repayment rule will not result in the introduction of tankers larger or in greater numbers that (sic) those already in use in any location." 52 Fed.Reg. at 23,533. MARAD also acknowledged that "it is possible that small Jones Act VLCCs, between 100,000 and 200,000 DWT, may be bumped from the Alaska–Panama trade as a result of this rule." *Id.* However, MARAD downplayed the potential effect of this "bumping" process. *Id.* at 23,532 ("[ ] MARAD believes that the distribution of tonnage employed in the domestic trade will not change substantially if the four VLCCs are allowed to remain in the trade"). *See also* AR at 1403 ("The Rule is not likely to change fleet configuration from 1986"). Essentially, the agency predicted that a bumping effect would occur in the future "as more VLCCs and other large tankers replace smaller tankers in the Valdez to Panama trade." AR at 1403.[11]

MARAD analyzed the effects of the "bumping" process, assuming that it does occur. MARAD concluded that, should

9. Nor could the parties dispute this, as all four of the VLCCs eligible for repayment pursuant to the 1987 proposal were already operating in the domestic trade under the authority of MARAD's 1985 Rule.

10. Although OSG joined in the comments submitted by the Independent Tanker Owners Committee ("ITOC"), *see* AR at 820, ITOC did not quarrel with the choice of the 1983 data base, either. *See* AR at 872–902; AR 1291–1297.

11. OSG's claim that MARAD's conclusion is inconsistent fails. MARAD concluded that the Rule would not significantly impact the environment because shipping patterns would remain the same if the rule were adopted. MARAD also concluded that, even without the proposed rule, the temporary waiver process would

ensure the same level of VLCC shipping activity, with the same long-run effects. MARAD also conclude that failure to adopt the rule *and* failure to allow temporary waivers would increase oil spill risks since more, albeit smaller, ships would engage in the domestic oil trade. *See* discussion, *infra.* Rather than limit itself to the rule versus no-rule scenarios, OSG seizes upon MARAD's prediction of future trends, specifically the impacts if VLCCs were to replace smaller tankers over time, as a means to undermine this very limited rule. OSG's tactic would be more appropriate if the rule introduced more VLCCs to the trade, or if the rule significantly changed shipping patterns. This proposal *in itself* has none of the above effects.

"bumping" occur, some vessels which have drafts exceeding the port or terminal limitations may need to reduce the draft by reducing their cargo. This may be accomplished by lightering, "transferring oil to smaller tankers or barges", or by light-loading at the point of origin. AR at 1395. Based on the historical data, MARAD acknowledged that "[m]inimal lightering may have been necessary on the West Coast" and that an insignificant increase in lightering occurred on the Gulf Coast, possibly due to the operation of these four VLCCs in the trade. 52 Fed.Reg. at 23,533.

OSG claims that the agency ignored the impacts of lightering, and argues that lightering may tend to increase the number of ships at sea and thereby increase the risk of spills. Although the agency's analysis of lightering is not as thorough as it could have been in these circumstances, the Court finds that the agency did take a "hard look" at lightering, and did not act irrationally.

First, the agency identified the possibility of increased lightering resulting from the 1987 Rule. *See id.* (pointing out small increases in West and Gulf Coasts between 1983 and 1986 periods). Despite the possible increase in lightering, however, the agency determined that lightering would not increase significantly. For example, the agency pointed out that lightering is a product of market economies, which are difficult to predict with any certainty. "Shippers weigh the cost of lightering against the cost of using small tankers without lightering." AR at 1395. Secondly, MARAD notes that some ships, such as the *Bay Ridge,* called light-loaded at Los Angeles, thereby further reducing the need for lightering while still achieving some economy of scale in terms of the amount of crude oil which could be transported. *See* AR at 1395. Moreover, MARAD considered the future potential for further reduction in lightering due to technological advances given that Exxon took delivery of two non-CDS VLCC tankers with drafts designed to call fully-loaded in Los Ange-

les. *See* AR at 1395. Finally, MARAD also suggested means through which lightering could be "avoided altogether." AR at 1395 (redistribution of tonnage to ships of 55,000 DWT might avoid most lightering in East and Gulf ports). This assessment of the many factors contributing to lightering trends support MARAD's determination that there was not a risk of any significant long-term lightering increases resulting from the rule. *Cf. Competitive Enterprise Institute, supra,* 901 F.2d at 121 (NHTSA conceded the relationship of car size and safety, yet did not recommend reducing CAFE restraints due to its finding that the "relationship to be more complex than petitioners were willing to concede").

MARAD also analyzed the risks of an oil spill associated with lightering by evaluating the overall impact of the "bumping" process. Should "bumping" occur, "the total number of trips per year would decrease, due to the larger capacity of the VLCCs." AR at 1391. This reduction in the total number of trips would result in an overall decrease in the risk of an oil spill at all domestic ports, because the risk of spill is "directly related to the number of port calls." AR at 1416. *See also* AR at 1400 ("the calculation of oil spill risk uses spill probability rates of .00072 impact events per day per port call, and .000017 non-impact events per tanker day in transit and loading/unloading").[12] Moreover, while lightering does involve port calls, a lighter picks up the oil from the VLCC off-shore and makes only one call to a port while carrying oil. This is compared to the two "in port" trips which another oil-carrying vessel would require. *Cf.* AR at 71. These factors also supported the agency's determination that, on balance, lightering would not have any significant impacts on the environment.

OSG challenges these figures and directs the Court to review the results of a study of tanker traffic at Puget Sound conducted by the Coast Guard. *See* U.S. Department of Transportation, U.S. Coast Guard, *Final Environmental Impact Statement: Puget*

---

**12.** The agency also noted that the spill risk prediction was "conservative" because "more recent figures indicate an improvement in worldwide spill rates." AR at 1400.

*Sound Vessel Traffic Service—Tank Vessel Operations Regulation,* 1982 (hereinafter, "Puget Sound study"). The Puget Sound study evaluated the environmental impacts of introducing 200,000 DWT vessels into the Puget Sound, and counseled against allowing the larger vessels into the area. *Id. See also* 52 Fed.Reg. at 23,533. The Puget Sound study also evaluated the risks associated with lightering the 200,000 DWT vessels and concluded that lightering posed a risk in addition to the risk posed by the port to port call of the larger tanker. *See* Puget Sound Study at 46, 50.

MARAD considered the Puget Sound study in its evaluation. *See* AR at 160. *See also* 52 Fed.Reg. at 23,533. However, MARAD determined that the Puget Sound study did not have any precedential value for purposes of the CDS repayment plan. In MARAD's view, because the CDS repayment would not introduce ships of greater size into the affected sea lanes, the magnitude of the change introduced by the entry of 200,000 DWT VLCCs into the Puget Sound distinguished the Puget Sound scenario from the proposed Rule. *See* 52 Fed. Reg. at 23,533. This rationale is a plausible one, and the Court will not upend an agency's considered judgment on matters within its own technological expertise. *See, e.g., Sierra Club v. Dept. of Transp., supra,* 753 F.2d at 129 (courts do not rule on merits of competing scientific opinion, and only evaluate to ensure that "the agency had before it all the data to make an informed decision that adequately took account of the important environmental concerns").

4. *MARAD Considered the Risk of a Catastrophic Oil Spill and Rationally Concluded That the Proposed 1987 Rule Would Not Increase the Risk of an Oil Spill*

MARAD admits that there exists a risk of catastrophic oil spill when VLCCs operate in the trade, and acknowledges that such a spill "could have a significant adverse impact on marine and estuarine organisms, the commercial fishing industry and tourism." AR at 1399 (referring also to the 1985 EA, which discussed the litera-ture in more depth). OSG asserts that the agency should have further evaluated the risk and impacts of a catastrophic spill, and should have recognized that the risk of such a spill would increase as VLCCs embark on more voyages.

The impact of oil spills has been examined in depth in numerous EIS reports prepared over the years. *See* discussion, *supra,* at Section III.C.1. The agency was entitled to rely on these prior studies unless the proposed 1987 Rule would introduce new and unknown risks to the environment. *See id.* Here, MARAD flagged the potentially serious consequences of an oil spill by a VLCC, and proffered a rational explanation for its conclusion that the proposed 1987 Rule would not increase these risks significantly.

MARAD determined that the 1987 Rule would effectively sustain the status quo in which the four VLCCs were already operating on a continual basis, and would not increase the number, size or configuration of ships in commerce. Thus, the risks engendered by the proposed rule would not exceed the current oil spill risk. 52 Fed. Reg. at 23,532, 23,533. *See also* AR at 1403 ("The rule is not likely to change fleet configuration from 1986"). Moreover, the agency concluded that, if the proposed 1987 Rule were not adopted, the number of VLCCs in the trade would not change; given the level of temporary waivers granted in recent years, the shortfall in available tonnage would be met by VLCCs in any event. *See* AR at 1392. However, if the proposed rule were rejected and if the agency refused to grant temporary waivers, there would be an increase in the overall oil spill risk. *See* AR at 1403.

OSG contends that, if the VLCCs "bump" smaller tankers from the Alaska–Panama trade, there will be an increased risk of a catastrophic spill. According to OSG, the bumping process essentially demands that the four CDS–VLCCs in question sail more frequently than they would absent the proposed repayment rule. *See* OSG Reply Memorandum at 7. This, according to OSG, increases the risk of catastrophic spill. *Id.*

Whether the bumping process will actually occur, and the extent of this bumping, is a matter of great debate. In its considered judgment, the agency determined that this particular rule would not have a significant bumping effect. *See, e.g.,* 52 Fed.Reg. at 23,532 ("the distribution of tonnage in the domestic tonnage will not change substantially if the four VLCCs are allowed to remain in the trade"); AR at 1403 (fleet configuration will not change as a result of rule).[13] However, in spite of this finding, the agency nevertheless carefully considered OSG's argument and determined that reducing the overall risk of an oil spill was preferable to eliminating any incremental increase in catastrophic spill risks caused by bumping. "The total number of trips and port calls would decrease due to the larger carrying capacity of the VLCCs, thus reducing the overall risk of any accidental oil spill." *Id.* Furthermore, eliminating the four VLCCs from the trade, as OSG apparently recommends, would actually increase the risk of oil spill:

> If the four VLCCs are removed from the ANS trade, a larger number of smaller tankers will operate making more voyages with more risk of collision than the VLCCs which are fewer in number and make fewer voyages and port calls.

*Id.* OSG never disputes the underlying statistical basis for concluding that risks are greater at port than at sea. Moreover, the trade-off between reducing the overall spill risk at the expense of potentially increasing VLCC spills has been recognized by other analysts. *See, e.g.,* Puget Sound Study at C–24.

The agency also balanced the increase in overall oil spills at all ports against the fact that a spill by a VLCC would most likely affect only those ports in the Alaska–Panama trade. The remainder of the VLCC risk would be felt far offshore where there is less risk of a spill occurring. *Id.* Although the agency did not estimate "the probability with which various quantities of

oil might be accidentally released as a result of the proposed rule," the agency did rely on the available literature in concluding that "the worldwide distribution of spill sizes from tankers indicates a large number of small spills and a very few large spills." AR at 155.[14] Finally, the agency noted that, in general, "the risk of a major spill is slight." *See* AR at 130.

OSG, and even the Court for that matter, might disagree with MARAD's assessment of the likely impacts of the 1987 Rule. However, the Court's role is only to ensure that the agency took a "hard look" at the available evidence. MARAD did so with regard to the risks associated with lightering and the risk of catastrophic oil spill. Whether the Court agrees with the agency's ultimate recommendation that the risks will not significantly increase is immaterial. MARAD's conclusion that the 1987 Rule will not have any significant impact on the environment is a rational one, and MARAD's decision with respect to the 1987 Rule's consequences on the human environment must stand given that this judgment was made in a rational manner. *Public Citizen, supra,* 848 F.2d at 267. "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1990). The Court finds that MARAD followed the process here.

### IV. CONCLUSION

Upon consideration of the cross-motions for summary judgment, the Court finds that the Plaintiff does have standing to prosecute a NEPA claim, that stare decisis and the law of the case do not bar the Court from considering Plaintiff's claim, and that the agency did take the required "hard look" at the available evidence in evaluating the environmental impacts of the 1987 Rule. Accordingly, the Court

---

**13.** *See* note 11, *supra.*

**14.** Failure to perform an extensive study of this nature is justified in light of the agency's determination that shipping patterns and the number of tankers already in the domestic commerce would not change as a result of the 1987 Rule. Embarking on a more extensive EIS to investigate the overall distribution of spill volumes would be unnecessary in light of this finding.

hereby denies the Plaintiff's motion for summary judgment and hereby grants the Federal Defendants' and Defendant–Intervenors' motions for summary judgment.